IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KATHERINE M. REHM, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 1:21-cv-00237 |
| YOUNG MEN'S CHRISTIAN ASOCIATION OF GREATER WAUKESHA COUNTY, INC. | ) **Jury Trial Demanded** |
| Defendant. | ) |

# COMPLAINT

Plaintiff, Katherine M. Rehm, for her Complaint against Defendant Young Men's Christian Association of Greater Waukesha County, Inc. ("YMCA-GWC"), alleges as follows:

## JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the Equal Pay Act, 29 U.S.C. §§ 206 *et seq.*

2. Pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in this district because a substantial part of the events and omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

1

## PARTIES

3. Rehm is a resident of the State of Wisconsin and worked at the YMCA-GWC. At all relevant times, Rehm was an "employee" under all relevant statutes.

4. YMCA-GWC is a Wisconsin-registered non-stock corporation with a principal place of business located at 3610 Michelle Witmer Memorial Drive, Suite 100, New Berlin, Wisconsin 53151. At all relevant times, YMCA-GWC was an "employer" within the meaning of all relevant statutes.

5. The YMCA-GWC provides youth development, healthy living, and social responsibility programs as multiple branch office locations.

## ADMINISTRATIVE PREREQUISITES

6. On May 27, 2020, Rehm filed a Complaint of Discrimination with the Equal Rights Division of the Wisconsin Department of Workforce Development and the United States Equal Employment Opportunity Commission ("EEOC"), alleging discrimination and retaliation under Title VII and the EPA. On December 28, 2020, the EEOC issued a Notice of Right to Sue.

7. All prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

**I. Background**

8. Rehm has spent her entire post-college 20-year career working for YMCA associations, including associations in Wisconsin, Indiana, and Illinois. Her work for YMCAs began at the YMCA of Metro Milwaukee in May 1996, when she was 16 years old.

9. In November 2011, after working for YMCA associations in Indianapolis, IN and metropolitan Chicago, IL, Rehm rejoined YMCA of Metropolitan Milwaukee as the Executive Director of its Southwest Branch.

10. The Southwest Branch was acquired by and merged into the YMCA-GWC in 2014 as a result of the bankruptcy and reorganization of the YMCA of Metropolitan Milwaukee.

11. Rehm assisted with the transition of the Southwest Branch beginning in June 2014 and in October 2014 (when the acquisition was complete), she accepted a position with the YMCA-GWC as the Southwest Branch Executive Director.

## II. Rehm's Promotion and Pay Disparity

12. On December 1, 2016, Chief Executive Officer Chris Becker promoted Rehm to Vice President of Operations, reporting directly to Becker.

13. Becker placed Rehm in charge of Marketing, Membership, Financial Development, and Healthy Living, and she had two directors reporting to her for those departments. Rehm also continued to manage the Southwest Branch and led a team of nine directors (including five direct reports), until November 2018 when a new Branch Executive was hired.

14. At the same time Becker promoted Rehm to VP of Operations, Becker promoted Geoff Mertens from Executive Director of the YMCA-GWC's Waukesha Branch to VP of Operations, also reporting to Becker.

15. Becker placed Mertens in charge of the YMCA-GWC's branch operations and the branch executives reported to Mertens (other than Rehm during the period she still managed the Southwest Branch).

16. In their VP of Operations positions, Rehm and Mertens were members of the Association Executive Leadership Team as well as the Administration team (which, during the relevant period, was comprised of Becker, Chief Financial Officer Linda Daley, Rehm, and Mertens).

3

17. Rehm and Mertens have substantially similar management experience and skill, and they had substantially similar management and operational responsibilities in their VP of Operations positions. Both were responsible for managing senior level staff, setting the annual goals for their departments and staff members, and managing their budgets. Both lead branches and were responsible for all aspects of branch operations, including budget management and financial development. Rehm and Mertens also co-chaired the Association's Branch Operations Team and shared responsibility for providing leadership for all areas of operations.

18. Rehm had higher level strategic responsibility than Mertens as she managed Association-wide functions for the branches (e.g., marketing, membership, and financial development), not just the branches themselves.

19. Mertens's pay was higher than Rehm's when they were both promoted to VP of Operations and through the remainder of Rehm's employment with the YMCA-GWC.

20. When Rehm and Mertens were offered promotions to VP of Operations effective December 4, 2016, Rehm was offered an annual base salary of $88,000 and Mertens was offered $90,000, a $2,000 difference.

21. In 2018, Rehm's base salary was $96,123 and Mertens's was $98,308, a difference of $2,185.

22. In October 2018, when Rehm learned of the pay disparity, she raised the issue with Becker and asked him to reevaluate her pay. At that time, Becker had already decided to give Rehm a three percent (3%) annual merit increase for 2019. In response to her complaint, Becker agreed to change the increase to four percent (4%).

23. By increasing Rehm's salary in response to her complaint, Becker acknowledged that there was an unjustifiable gap between Rehm's and Mertens's pay.

24. The higher raise brought Rehm's pay closer to Mertens's pay but did not equalize their pay and did not make up for the past pay disparity.

25. In 2019, Rehm's base salary was $100,374 and Mertens's was $101,741, a difference of $1,367.

26. Because Rehm received less pay than Mertens, she also received lesser contributions to the YMCA Retirement Fund.

### III. Rehm's Record of Consistent Strong Performance

27. Rehm had a record of consistently strong job performance at the YMCA-GWC.

28. Rehm received only one formal performance review while employed at the YMCA-GWC, in 2015, when she was the Southwest Branch Executive Director, and it positively assessed her performance in all areas.

29. Rehm received a $2,000 incentive bonus for 2017, and in his email notifying her of the bonus, Becker referred to her "outstanding work throughout 2017."

30. Rehm received a $3,000 incentive bonus for 2018, and in his email notifying her of the bonus, Becker stated: "Thank you for your efforts throughout 2018. Through your dedication and successful leadership you were able to achieve the defined incentive targets."

31. In 2019, Mertens had a family matter that took him away from his duties much of the year.

32. In an email to the Association's Leadership Team and the West Suburban Branch Leadership Team on January 29, 2019, Becker directed that "Katie Rehm will oversee Branch Ops meetings in the interim and work together with branch Execs and advancement team to ensure open communication lines and cohesive operations," and that "[a]ny issues or questions (other

than what is listed above) that you typically would send to Geoff, please send to Katie Rehm and she will follow up on them with appropriate staff."

33. On July 24, 2019, the YWCA-GWC opened its New Berlin Wellness Center. Rehm had a lead role in developing the Center when planning began in February 2019, and Becker placed the Center under her operations management.

34. Becker's assignment of these additional significant responsibilities to Rehm in 2019 indicates his confidence in her skills and abilities.

35. Despite that Rehm was placed in charge of branch operations in Mertens's absence, was given management responsibility of the New Berlin branch, and maintained her management of Membership, Healthy Living, Marketing, and Financial Development operations, Becker did not equalize her pay with Mertens's pay in 2019.

36. On December 12, 2019, at Becker's request, Rehm (along with Rehm's direct report, Financial Development Director Kristen Stoll, and a branch executive) made a presentation on the Association's strategic planning work at a "rally" meeting of full-time employees. After the presentation, Becker complimented Rehm on her presentation. Mertens was not among the presenters.

37. The next day, December 13, 2019, Becker sent Rehm an email telling her she would receive a $1,500 incentive bonus for 2019. In his email, Becker wrote: "I know it has been a challenging year, but your leadership and commitments to our organization stands [sic] strong. Our success is attributed to your operational and strategic initiatives and high standards that are set across the association. It is with these major accomplishments that I award you $1,500 year end incentive compensation."

6

38. In Rehm's last one-on-one meeting with Becker on January 27, 2020 – which was for the purpose of reviewing her team's performance goals for 2020 – Becker approved the goals and was complimentary of her 2020 plan.

## IV. Rehm's Infertility Problems and IVF Treatments

39. Becker was aware that Rehm had infertility problems and that she was having difficulty conceiving a child.

40. On May 24, 2019, Rehm told Becker that she had gone through invitro fertilization (IVF) – an emotionally and physically stressful treatment – and that it had failed.

41. Becker was also aware that in August 2019, Rehm went through IVF a second time and that it failed to result in conception of child.

42. In late December, Rehm told Becker that she and her husband were trying IVF a third time.

43. During Rehm's one-on-one meeting with Becker on January 27, 2020, Rehm told him that she had an egg-transfer procedure the next day (January 28) and asked if I could work from home the rest of the day. At that time, Becker asked how the process was going and Rehm let him know that after the following day's procedure, she was hopeful that she and her husband would have good news within the next few weeks.

44. Rehm scheduled her medical appointments in the early morning and around work meetings as much as possible. Rehm often worked in the evenings and on weekends to keep up with her workload (as she had throughout her tenure at the YWCA-GWC).

## V.     Rehm's Abrupt Termination Without Warning

45.     On February 13, 2020, Becker called Rehm into a meeting with Daley and Human Resources Director Laura Jazwiecki and told Rehm she was being terminated effective immediately.

46.     The termination was a complete and utter shock to Rehm.  At no time leading up to her firing did Becker ever notify Rehm orally or in writing that her performance was unsatisfactory in any way, let alone warn her that if she did not improve, she risked termination.

47.     Nothing changed in Rehm's job performance in the two months between when Becker awarded her the $1,500 incentive bonus on December 13, 2019, telling her that her "leadership and commitments to our organization stands [sic] strong" and that "[o]ur success is attributed to your operational and strategic initiatives and high standards," and her abrupt discharge on February 13, 2020.

48.     In the February 13, 2020 termination meeting, Rehm asked Becker what she did to deserve getting fired.  Becker stated they were not getting the leadership they needed from her, that there were times when her staff did not know where she was and they had to go to others with questions, and that she missed some meetings.

49.     Becker provided no details to support that articulated reason.  Nor did Becker give Rehm the opportunity to give her explanation for any alleged performance issue.

50.     In response, Rehm reminded Becker that he never once had a conversation with her about her performance not meeting expectations and that in every conversation they had, he was positive, complimentary, and stated that she was on the right track and was focused on what she needed to focus on.  Becker did not respond or otherwise dispute Rehm's assertions.

8

51. Rehm also asked Becker why, if he had a problem with her performance, he did not tell her and let her know what more he needed. Becker did not respond to Rehm's question.

52. In response to Rehm's comments and questions, Human Resources Director Laura Jazwiecki interjected that in Wisconsin, there is "employment at will."

53. Daley interjected, "At this level we know if we are providing good leadership and don't need to be told," or words to that effect.

54. At the end of the termination meeting, Rehm told Becker that her third IVF was successful and that she was pregnant. Becker said nothing in response and walked out of the room.

55. Becker expressed no gratitude for Rehm's many contributions, not even in his February 13, 2020 termination letter.

56. After more than 20 years of highly-rated, successful employment with YMCA associations, including promotions to the executive level, Becker abruptly ended Rehm's YMCA career – a career that she planned to continue until her retirement.

57. Rehm was walked out of the office and given no opportunity to say good-bye to any of her long-term colleagues. Rehm was treated like she had done something seriously wrongful or shameful.

58. All five of Rehm's direct reports contacted Rehm after learning of her discharge, and expressed their shock, sadness, and support.

59. Ms. Rehm was always available to her direct reports, whom she trained and with whom she developed a strong rapport.

60. After Rehm's discharge, upon information and belief, Becker assigned management of the New Berlin Wellness Center and Financial Development to Mertens.

9

## VI. Becker's Refusal to Refund Rehm's Donation

61. During a January 9, 2020 leadership team meeting, Becker directed that all full-time employees were required to donate to the YMCA-GWC in 2020 and expressed his frustration about what he viewed as a low level of employee giving in 2019.

62. During a financial development meeting on January 30, 2019, with Becker, Stoll, and Mertens, Becker repeated the full-time employee donation requirement. Rehm spoke up and told Becker that she did not believe that the YMCA could mandate employee donations but could encourage them. Becker did not appreciate that Rehm challenged his directive.

63. To comply with Becker's directive and demonstrate her ongoing commitment to the YMCA-GWC and its mission, on February 6, 2020, Rehm made a $1,500 donation.

64. Rehm had previously made a $1,000 donation on October 19, 2019 to the YMCA-GWC's New Berlin Annual Campaign. She also made donations to the YMCA-GWC in 2016, 2017, and 2018.

65. When Rehm was fired on February 13, 2020 – a week after her February 6, 2020 $1,500 donation – Rehm asked that the amount be refunded primarily due to the financial impact of her sudden firing.

66. On February 15, 2020, Jazwiecki sent Rehm an email stating: "I called Chris [Becker] after our meeting today and asked about the refund of the donation you made last week. He said that with a signed severance agreement he would issue a refund."

67. Rehm would have had to release all of her claims against the YMCA-GWC by signing the agreement.

68. Rehm felt Becker's refusal to refund her donation was coercive and retaliatory. She refused to sign the severance agreement and the YMCA-GWC did not refund her donation.

69. Rehm's pregnancy was high-risk given her fertility and pregnancy problems and her age (she turned age 40 during her pregnancy).

70. Becker's firing of Rehm and his refusal to return her $1,500 donation added to the stress of an already stressful pregnancy. Rehm delivered premature twin boys in mid-July 2020, about three months before the due date.

## VII. Becker's Anti-Pregnancy Comments

71. Becker made anti-pregnancy comments to Rehm and other female YWCA-GWC employees. On December 12, 2019, in the presence of Rehm and other female employees, Becker stated, "No one else on [Rehm's] team is allowed to get pregnant," and "I am going to have to change the water." On another occasion, Becker stated to a pregnant female employee, "You are done after two, right."

72. Becker also commented negatively about female employees using the YMCA-GWC's childcare programs (which they received at a discounted rate).

**FIRST CAUSE OF ACTION**
(Unequal pay because of gender in violation of Title VII)

73. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

74. By the acts and practices described above, Defendant violated Title VII by paying Plaintiff lower wages than Mertens, a male employee, for substantially similar work.

75. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer monetary and other harm.

76. Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Title VII, warranting punitive damages.

## SECOND CAUSE OF ACTION
### (Unequal pay in violation of the EPA)

77. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

78. By the acts and practices described above, Defendant violated the Equal Pay Act by paying Plaintiff lower wages than Mertens, a male employee, for substantially similar work.

79. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer monetary and other harm.

80. Defendant's unlawful and discriminatory actions were willful and showed reckless disregard for Plaintiff's statutorily protected rights, warranting liquidated damages.

## THIRD CAUSE OF ACTION
### (Termination because of gender and/or child-bearing capacity in violation of Title VII)

81. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

82. By the acts described above, Defendants discriminated against Plaintiff based on her sex and/or child-bearing capacity in violation of Title VII.

83. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer monetary and/or other economic harm, including damage to her 20-year YMCA career.

84. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

85. Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Title VII, warranting punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**

86. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

87. Defendant retaliated against Plaintiff in violation of Title VII for her complaint of pay inequity by terminating her employment and refusing to refund her donation.

88. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer monetary and/or other economic harm, including damage to her 20-year YMCA career.

89. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

90. Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Title VII, warranting punitive damages.

**FIFTH CAUSE OF ACTION**
**(Retaliation in violation of the EPA)**

91. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

92. Defendant retaliated against Plaintiff in violation of the EPA for her complaint of pay inequity by terminating her employment and refusing to refund her donation.

93. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer monetary and other harm.

94. Defendant's unlawful and discriminatory actions were willful and showed reckless disregard for Plaintiff's statutorily protected rights, warranting liquidated damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, through the following relief:

A. A declaratory judgment that the actions of Defendants complained of herein violate the laws of the United States;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past lost income;

D. An award of damages in an amount to be determined at trial, plus prejudgment interests, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F. An award of punitive damages in an amount to be determined at trial;

G. An award of liquidated damages in an amount to be determined at trial;

H. An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

I. Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 22, 2021

Respectfully submitted,
**LINDNER LAW, LLC**

By: s/Laura A. Lindner
      Laura A. Lindner

648 N. Plankinton Ave. – Suite 418
Milwaukee, WI 53203
(414) 409-1242
laura@lindnerlawllc.com

*Attorneys for Plaintiff*