UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KATHERINE M. REHM,

        Plaintiff,

  v.                                      Case No. 21-cv-237-pp

YOUNG MENS CHRISTIAN ASSOCIATION
OF GREATER WAUKESHA COUNTY, INC.,

        Defendant.

---

**ORDER DENYING WITHOUT PREJUDICE DEFENDANT'S PARTIAL MOTION TO DISMISS CLAIM THREE OF COMPLAINT (DKT. NO. 7) AND DENYING PLAINTIFF'S REQUEST FOR ATTORNEYS' FEES AND COSTS (DKT. NO. 11)**

---

**I.    Introduction**

On February 22, 2021, the plaintiff filed a complaint against the defendant, Young Men's Christian Association of Greater Waukesha County, Inc. (YMCA). Dkt. No. 1. The plaintiff makes five claims of employment discrimination based on her termination in February 2020—Title VII and Equal Pay Act (EPA) violations, respectively, based on gender, id. at 11-12, and Title VII and EPA retaliation claims, id. at 13-14.

On March 17, 2021, the defendant filed a partial motion to dismiss the plaintiff's third claim (the allegation of employment discrimination under Title VII for unlawful termination because of gender and/or child-bearing capacity) under Rule 12(b)(6),. Dkt. No. 7. The court will deny that motion.

In her brief opposing the defendant's motion, the plaintiff has asked that the court award her attorneys' fees for the costs of bringing her response,

1

calling the defendant's motion "frivolous." Dkt. No. 11 at 5. The court will deny that request.

**II.    Facts**

The plaintiff is a Wisconsin resident. Dkt. No. 1 at ¶3. The defendant is a Wisconsin-registered corporation with its principal place of business in New Berlin, Wisconsin. Id. at ¶4. The plaintiff alleges that she began working at the YMCA of Metro Milwaukee at age sixteen, and spent her "entire post-college 20-year career" working for YMCA associations in Wisconsin, Indiana and Illinois. Id. at ¶8. She asserts that in November 2011, she rejoined YMCA of Metropolitan Milwaukee as the executive director of its southwest branch. Id. at ¶9. The plaintiff alleges that in 2014, the southwest branch was acquired by the YMCA-GWC (the defendant); the plaintiff alleges that she assisted in the transition and, once it was complete, was given a position as Southwest Branch Executive Director. Id. at ¶¶10-11.

The plaintiff alleges that in December 2016, CEO Chris Becker promoted her to Vice President of Operations, reporting directly to Becker. Id. at ¶12. The plaintiff says that Becker put her in charge of "Marketing, Membership, Financial Development, and Healthy Living," and that she had two directors reporting her in those departments. Id. at ¶13. The plaintiff asserts that she also continued to manage the southwest branch, leading a team of nine directors until November 2018 when a new branch executive came on board. Id.

At the same time Becker promoted the plaintiff to VP of Operations, he allegedly promoted Geoff Mertens from executive director of the defendant's Waukesha branch to VP of operations, reporting to Becker. Id. at ¶14. The plaintiff says she and Mertens were members of the association executive

2

leadership team and the administrative team. Id. at ¶16. She alleged that she and Mertens have "substantially similar management experience and skill," and that they had "substantially similar management and operational responsibility in their VP of Operations positions." Id. at ¶17. According to the plaintiff, both she and Mertens were responsible for managing senior staff, setting goals for departments and staff members and managing budgets. Id. The plaintiff alleges, however, that she had "higher level strategic responsibility than Mertens," because she managed association-wide functions such as marketing, membership and financial development. Id. at ¶18. She asserts that despite this fact, Mertens received a higher salary, both at the time they were promoted and throughout the time the plaintiff was employed by the defendant. Id. at ¶19. She says at the time of their promotions, she was offered a base salary of $88,000, while Mertens was offered a base salary of $90,000— $2,000 more. Id. at ¶20. She asserts that in 2018, while her base salary was $96,123, Mertens's was $98,308, a difference of over $2,100. Id. at ¶21.

The plaintiff asserts that when she learned of this disparity in October 2018, she raised the issue with Becker and asked him to "reevaluate her pay." Id. at ¶22. She says that at that point, Becker already had decided to give her a 3% annual merit pay increase for 2019, but in response to the plaintiff's complaint, he agreed to give her a 4% increase. Id. The plaintiff says that Becker's agreement to give her the additional 1% increase constituted an acknowledgment on his part that there "was an unjustifiable gap between [the plaintiff's] and Mertens's pay." Id. at ¶23. While the 4% raise "brought [the plaintiff's] pay closer to Mertens's," it did not equalize their pay "and did not make up for the past pay disparity." Id. at ¶24. The plaintiff says that because

3

her pay was lower than Mertens's, she also "received lesser contributions to the YMCA Retirement Fund." Id. at ¶26.

The plaintiff asserts that she maintained a "record of consistently strong job performance" while working for the defendant. Id. at ¶27. She says she had only one formal performance review, which took place in 2015 and which gave her a positive assessment in all performance areas. Id. at ¶28. In 2017, she received $2,000 incentive bonus; in his email notifying her of the bonus, Becker "referred to her 'outstanding work throughout 2017.'" Id. at ¶29. In 2018, the plaintiff received a $3,000 incentive bonus; in the email notifying her of that bonus, Becker said, "Thank you for your efforts throughout 2018. Through your dedication and successful leadership you were able to achieve the defined incentive targets." Id. at ¶30.

The plaintiff asserts that in 2019, Mertens had a "family matter that took him away from his duties much of the year." Id. at ¶31. She says that on January 29, 2019, Becker sent an email to the leadership teams of both the association generally and the west suburban branch, directing that the plaintiff would oversee branch operation meetings and other responsibilities and telling staff that they should send to the plaintiff any issues they'd usually raise with Mertens. Id. at ¶32. The plaintiff asserts that in July of that year she had a "lead role" in developing the New Berlin Wellness Center, and that Becker put the center under her operations management. Id. at ¶33. The plaintiff asserts that all these responsibilities show that Becker had confidence in her skills and abilities. Id. at ¶34. Yet, she says, Becker did not equalize her pay with Mertens's. Id. at ¶35.

The plaintiff alleges that on December 12, 2019, she made a presentation at a "rally" meeting of full-time employees, and that she did this at Becker's

request; she says that after the presentation, Becker complimented her. Id. at ¶36. Mertens was not one of the presenters. Id. The plaintiff says that the next day she received a $1,500 incentive bonus for 2019 as well as an email from Becker stating,

> "I know it has been a challenging year, but your leadership and commitments to our organization stands [sic] strong. Our success is attributed to your operational and strategic initiatives and high standards that are set across the association. It is with these major accomplishments that I award you $1,500 year end incentive compensation."

Id. at ¶37. The plaintiff says that at her last one-on-one meeting with Becker on January 27, 2020—the purpose of which was to review her team's performance goals for 2020—"Becker approved the goals and was complimentary of her 2020 plan." Id. at ¶38.

The plaintiff says that Becker was aware that she had infertility problems and that she was having difficulty conceiving. Id. at ¶39. She alleges that on May 24, 2019, she told Becker that she had gone through in vitro fertilization, "an emotionally and physically stressful treatment," but that it had failed. Id. at ¶40. The plaintiff says that Becker also was aware that she'd gone through IVF a second time in August 2019, again without success. Id. at ¶41. She says that in late December, she informed Becker that she and her husband would be attempting IVF a third time. Id. at ¶42. The plaintiff says that during the one-on-one meeting on January 27, 2020, she told Becker that she had an egg-transfer procedure the following day and asked to work from home the rest of the day. Id. at ¶43. She says that Becker asked her how the process was going; she indicates that after the next day's procedure, she told Becker that she was "hopeful that she and her husband would have good news within the next few weeks." Id.

The plaintiff asserts that she scheduled her appointments in the early morning and "around work meetings as much as possible." Id. at ¶44. She says she often worked evenings and weekends to keep up with her work (as she had throughout her employment with the defendant). Id. The plaintiff alleges, however, that on February 13, 2020, Becker called her into a meeting and told her she was being fired, effective immediately. Id. at ¶45. The plaintiff describes the termination as a "complete and utter shock;" she says Becker never notified her in any way that her performance was unsatisfactory or that she was at risk of termination. Id. at ¶46. She asserts that nothing had changed in her job performance between the date she received the $1,500 incentive bonus (December 13, 2019) and the day she was fired. Id. at ¶47.

The plaintiff says that at the February 13, 2020 meeting, she asked Becker what she did to deserve being terminated. Id. at ¶48. She indicates that Becker told her that "they were not getting the leadership they needed from her, that there were times when her staff did not know where she was and they had to go to others with questions, and that she missed some meetings." Id. The plaintiff said Becker provided no details to support these assertions, nor did he give her the opportunity to explain any alleged deficiencies. Id. at ¶49. The plaintiff says she told Becker that he'd never talked with her about any deficient performance and that he had always lauded her performance; she says Becker did not respond and did not dispute these assertions. Id. at ¶50. The plaintiff alleges that she asked Becker why he did not let her know if he had problems with her performance; again, she says Becker did not respond. Id. at ¶51. The plaintiff says that the HR director, who was in the meeting, stated that in Wisconsin, "there is 'employment at will.'" Id. at ¶52. The plaintiff says that someone named "Daley," who also was in the meeting, said

6

something along the lines of, "At this level we know if we are providing good leadership and don't need to be told." Id. at ¶53. The plaintiff asserts that at the end of this meeting, she told Becker that the third IVF session had been successful and that she was pregnant, but Becker said nothing and walked out. Id. at ¶54.

The plaintiff says that she was walked out of the office, without having the opportunity to say goodbye to coworkers; she says that she was "treated like she had done something seriously wrongful or shameful." Id. at ¶57. She says that she believes that after her termination, Becker assigned the management of the New Berlin Wellness Center and the responsibility of financial development to Mertens. Id. at ¶60.

The plaintiff also explains that at a January 9, 2020 leadership team meeting, Becker "directed that all full-time employees were required to donate to the [defendant] in 2020 and expressed his frustration about what he viewed as a low level of employee giving in 2019." Id. at ¶61. Becker repeated this requirement at a financial development meeting on January 30, 2019;[1] at that meeting, the plaintiff told Becker that she did not believe the defendant could mandate employee donations but that it could encourage them. Id. at ¶62. The plaintiff says that Becker "did not appreciate" that she challenged his directive. Id. But to meet that directive, and to "demonstrate her ongoing commitment to the [defendant] and its mission," the plaintiff made a $1,500 donation on February 6, 2020. Id. at ¶63. She had made a $1,000 donation in October 2019, and had made donations in 2016, 2017 and 2018. Id. at ¶64.

---

[1] The plaintiff's complaint indicates that the meeting occurred on January 30, 2019; the court assumes the plaintiff meant January 13, *2020*.

The plaintiff says that when she was terminated on February 13, 2020—a week after making the 2020 donation—she asked for the donation to be refunded "primarily due to the financial impact of her sudden firing." Id. at ¶65. Two days later, she received an email from the HR director, saying that the HR director had asked Becker about the refund and Becker had said that "with a signed severance agreement he would issue a refund." Id. at ¶66. The plaintiff says that signing such an agreement would have required her to release all claims against the defendant. Id. at ¶67. She refused to sign the agreement because she felt it was coercive and retaliatory; the defendant did not refund the donation. Id. at ¶68.

Finally, the plaintiff asserts that she heard Becker make anti-pregnancy comments during her time as his employee. Id. at ¶¶71-72. The plaintiff alleges that on December 12, 2019, Becker said in front of the plaintiff and other female employees that "'[n]o one else on [the plaintiff's] team is allowed to get pregnant,' and 'I am going to have to change the water.'" Id. at ¶71. Becker allegedly also commented to a pregnant employee "[y]ou are done after two, right[?]" and made other, generally negative comments about female employees using the defendant's discounted childcare program. Id. at ¶¶71-72. The plaintiff asserts that her pregnancy was high risk, id. at ¶69, and that Becker's firing of her and his refusal to return her $1,500 donation "added to the stress of an already stressful pregnancy;" she delivered premature twins about three months before her due date, id. at ¶70.

### III.  Procedural History

The defendant filed its answer on March 17, 2021. Dkt. No. 5. The defendant filed this motion to partially dismiss the plaintiff's claims that same day. Dkt. No. 7.

## IV. Jurisdiction

The court has federal question jurisdiction under 28 U.S.C. §1331 because her claims fall under federal statute, Title VII and the EPA.

## V. Analysis

### A. Standard for Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990). When evaluating a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiffs' favor. AnchorBank, FSB v. Hofer, 649 F.3d 610, 614 (7th Cir. 2011). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In this context, "plausible," as opposed to "merely conceivable or speculative," means that the plaintiff must include "enough details about the subject-matter of the case to present a story that holds together." Carlson v. CSX Transp., Inc., 758 F.3d 819, 826-27 (7th Cir. 2014) (quoting Swanson v. Citibank, N.A., 614 F.3d 400, 404-05 (7th Cir. 2010)). "[T]he proper question to ask is still could these things have happened, not did they happen." Id. at 827 (internal quotation and citation omitted). The plaintiff "need not 'show' anything to survive a motion under Rule 12(b)(6)—he need only allege." Brown v. Budz, 398 F.3d 904, 914 (7th Cir. 2005).

9

B. <u>Claim Three – Title VII Termination Based on Gender and/or Child-bearing Capacity</u>

Title VII of the Civil Rights Act of 1964 says that "an employer may not discriminate based on 'race, color, religion, sex, or national origin.'" <u>Abrego v. Wilkie</u>, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting 42 U.S.C. §2000e-2(a)). To state a *prima facie* case of employment discrimination, the plaintiff must assert that: "(1) the employee is a member of a protected class, (2) she was meeting the employer's legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) similarly situated employees outside of the protected class were treated more favorably." <u>Langenbach v. Wal-Mart Stores, Inc.</u>, 761 F.3d 792, 801 (7th Cir. 2014). A plaintiff does not need to allege much detail to adequately allege a discrimination claim. In <u>Tate v. SCR Medical Transp.</u>, 809 F.3d 343 (7th Cir. 2015), the Seventh Circuit held:

> The other violations that the plaintiff complains of—sexual harassment, discrimination on the basis of his sex, and retaliation for engaging in protected activity—are adequately alleged, given our ruling in *Luevano v. Wal–Mart Stores, Inc., supra,* 722 F.3d at 1028, quoting *Tamayo v. Blagojevich,* 526 F.3d 1074, 1084-85 (7th Cir. 2008), that "to prevent dismissal under Rule 12(b)(6), a complaint alleging sex discrimination need only aver that the employer [had] instituted a (specified) adverse employment action against the plaintiff on the basis of her [or his] sex."

<u>Id.</u> at 346. The court must determine "whether the employer action in question treats [the plaintiff] 'in a manner which but for that person's sex would be different.'" <u>Hall v. Nalco Co.</u>, 534 F.3d 644, 649 (7th Cir. 2008) (quoting <u>City of Los Angeles, Dept. of Water and Power v. Manhart</u>, 435 U.S. 702, 711 (1978)).

The plaintiff clearly has plead at least two of these prongs. She is a female whom the defendant knew was seeking to get pregnant through invitro fertilization. Thus, she is a member of a protected class under Title VII as

amended by the Pregnancy Discrimination Act, Pub. L. No. 95-555, 92 Stat.2076 (1978). See Hall, 534 F.3d at 647. She also suffered an adverse action—she was terminated by the defendant on February 13, 2020.

The defendant asserts, however, that the plaintiff has not alleged that she was terminated "because of" her gender. Dkt. No. 8 at 6. It also alleges that the plaintiff has failed to state facts that show that she as terminated because of her child-bearing capacity. Id. at 7. The court disagrees.

The plaintiff says she was meeting the expectations of her employer as recently as December 13, 2019 when she received a $1,500 incentive bonus for 2019. The plaintiff alleges that in an email accompanying that bonus, Becker complimented her leadership. The next month, the plaintiff again received positive feedback from Becker on a presentation on future performance goals for her team. Yet, during the meeting in which she was terminated, only two weeks after her presentation and two months after receiving the bonus, Becker stated that "they were not getting the leadership they needed from her, that there were times when her staff did not know where she was and they had to go to others with questions, and that she missed some meetings." Dkt. No. 1 at ¶48. The plaintiff says she was not provided any further details on what was driving her termination. She also states that she was never given any warning leading up to her termination. The plaintiff has alleged sufficient facts to plead that she was in good standing prior to her termination.

As to the fourth prong, the Seventh Circuit has made clear that "adverse employment action based on childbearing capacity will always result in 'treatment of a person in a manner which but for that person's sex would be different.'" Hall, 534 F.3d at 649 (quoting Manhart, 435 U.S. 702 at 711). The plaintiff alleges that she received a merits-based bonus just two months before

her conversations with Becker about her hopes that the third IVF procedure would be successful. The complaint details that in the plaintiff's last one-on-one meeting with Becker, seventeen days before her termination, Becker approved the plaintiff's performance goals for 2020 and "was complimentary of her 2020 plan." Dkt. No. 1 at ¶38. The plaintiff also spells out the lack of any warning or indication that her employment was in jeopardy. Dkt. No. ¶46. She says she never heard any word of problems with her performance and was not provided any further details on the merits of her termination. Id. at ¶¶50-51.

The complaint alleges that Becker knew of the plaintiff's problems getting pregnant and knew that she had sought IVF for a third time in the months leading up to her termination. Id. at ¶¶42-44. The plaintiff alleges that Becker previously had made "anti-pregnancy comments" to the plaintiff and other female employees. Id. at ¶71. The plaintiff alleges that on December 12, 2019—just two months before the plaintiff was terminated—Becker said "[n]o one else on [the plaintiff's] team is allowed to get pregnant," and "I am going to have to change the water" while in the plaintiff's presence. Id. On a separate occasion, Becker allegedly told a pregnant female employee, "You are done after two, right." Id. Finally, the plaintiff alleges that Becker had made negative comments about female employees' use of the defendant's childcare programs. Id. at ¶72. The combination of these statements supports the plaintiff's conclusion that she was discriminated against based on her sex or child-bearing capacity. Id. at ¶82. She makes clear that she believes Becker's official reasoning for the termination was pretextual and explains the inconsistencies causing her to doubt that reasoning. See Coleman v. Donahoe, 667 F.3d 835, 852 (7th Cir. 2012) (requiring the plaintiff alleging pretext to "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the

12

[defendant's] asserted reason that a reasonable person could find [it] unworthy of credence." (internal quotation marks omitted)).

The defendant alleges that there is no indication Becker directed these comments at the plaintiff. Dkt. No. 8 at 9. But at the pleading stage, the plaintiff does not have to prove her case. She needs only allege sufficient facts to make her claim plausible. The totality of the plaintiff's claims puts the defendant on notice of the conduct for which it is being sued in claim three. The defendant also argues that the plaintiff has not linked Becker's alleged comments to the plaintiff informing him of her pregnancy. Dkt. No. 8 at 10. But the plaintiff has alleged that she had asked Becker to be able to take off work for a medical appointment and has indicated that one of the reasons she was given for her termination was being out of the office and missing meetings. This is enough at the pleading stage.

The court will deny the defendant's partial motion to dismiss claim three.

## VI. Attorney's Fees

The plaintiff has asked the court to order the defendant pay for attorney's fees for what she calls "a frivolous motion." Dkt. No. 11 at 5. She argues that the defendant did not cite recent Seventh Circuit law and that it ignored many relevant facts. Id. at 4. She asserts that defense counsel wasted her time and the court's by filing the motion. Id. at 5.

The court agrees with the defense that the plaintiff's request amounts to "an attempt to sanction . . . an adversarial opponent for litigating a disputable claim." Dkt. No. 14 at 6. Courts are reluctant to impose sanctions absent extraordinary circumstances. A defendant disputing the plaintiff's claim under Rule 12(b)(6) is not one of those circumstances.

The court will deny the plaintiff's request for sanctions.

## VII. Conclusion

The court **DENIES without prejudice** the defendant's partial motion to dismiss. Dkt. No. 7.

The court **DENIES** the plaintiff's request for an order requiring the defendant to pay her attorney's fees. Dkt. No. 11.

Because this order has addressed the defendant's partial motion to dismiss, the court **ORDERS** that the telephonic motion hearing currently set for July 27, 2021 at 1:30 PM is cancelled and **REMOVED** from the court's calendar.

Dated in Milwaukee, Wisconsin this 19th day of July, 2021.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER
Chief United States District Judge**