IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

KATHERINE M. REHM,                       )
                                         )
        Plaintiff,                       )
                                         )
vs.                                      )        Case No. 1:21-cv-237-pp
                                         )
YOUNG MEN'S CHRISTIAN                    )
ASSOCIATION OF GREATER                   )
WAUKESHA COUNTY, INC.                    )
                                         )
        Defendant.                       )

---

## **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

## <u>INTRODUCTION</u>

After 20 years of dedicated service to YMCAs, including more than 5 years with Defendant YMCA-GWC and an unblemished performance record, the YMCA-GWC's CEO Chris Becker concocted allegations of unsatisfactory job performance to fire Plaintiff Katherine ("Katie") Rehm when he knew she was undergoing infertility treatment to conceive a child. Just two months before firing Rehm, Becker awarded Rehm an incentive bonus and commended her for her "leadership and commitments to our organization" and attributed the organization's "success … to [her] operational and strategic initiatives and high standards." Just two weeks before firing Rehm, Becker approved her team's 2020 performance goals and complimented her 2020 plan. As Becker admits, at no time did he ever tell Rehm that her job performance was unsatisfactory and needed improvement. While Becker was complimenting and rewarding Rehm's performance, he was also making anti-pregnancy comments to Rehm and her pregnant team members.

1

When Rehm questioned and pressed Becker for what she had or had not done to justify her sudden discharge, Becker provided her no specifics. When Rehm challenged her treatment as unlawful in her underlying administrative charge, the YMCA-GWC manufactured false reasons in its submissions to the investigating governmental agency, the Equal Rights Division of the Wisconsin Department of Workforce Development ("ERD"). When Becker was questioned in his deposition, he was untruthful – even falsely implicating the YMCA-GWC's Board Chair in the termination process – and changed his testimony when confronted with its falsity or implausibility. And now in its motion for summary judgment, the YMCA-GWC continues to fail to offer specific facts supporting its vague accusations that Rehm demonstrated a lack leadership, a lack of communication, and a lack of availability.

The record before the Court contains an abundance of evidence from which a jury could reasonably doubt the vague, shifting, inconsistent, and dated reasons the YMCA-GWC has given for firing Rehm and for paying her less than her male counterpart. Accordingly, Rehm's Title VII gender-based termination and pay discrimination claims must be decided by a jury and the YMCA-GWC's motion to avoid a trial on the claims must be denied.[1]

---

[1] Citations to "Pl.'s Facts" are to Plaintiff's Statement of Additional Facts in Opposition to Defendant's Motion for Summary Judgment. Citations to "Def.'s Facts" are to Defendant's Statement of Proposed Facts in Support of Its Motion for Summary Judgment. Citations to "Rehm's Decl." are to the separately filed Declaration of Katherine M. Rehm. Citations to "Lindner Decl." are to the separately filed Declaration of Laura A. Lindner. Lindner's Declaration also contains the additional record evidence cited in this brief, Pl.'s Facts, and in Plaintiff's Response to Def.'s Facts, including deposition testimony and deposition exhibits.

<u>**ARGUMENT**</u>

I.  **THE COURT CANNOT GRANT SUMMARY JUDGMENT ON REHM'S TITLE VII GENDER-BASED WRONGFUL TERMINATION CLAIM.**

In her third cause of action, Rehm alleges that the YMCA-GWC terminated her employment because of her gender and/or child-bearing capacity[2] in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"). (Dkt. #1, ¶¶ 81-85). There are disputed issues of material fact that preclude summary judgment on the claim.

**A.  The Record Contains An Abundance of Pretext Evidence From Which Discriminatory Intent May Be Reasonably Inferred.**

Under the Seventh Circuit's approach to discrimination cases, at summary judgment, the Court must review the evidence as a whole, focusing on the core question, which is whether the evidence would permit a jury to reasonably infer that a discriminatory reason was a motivating factor in the plaintiff's discharge. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself … . Evidence is evidence." *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 933 (7th Cir. 2020) (quoting *Ortiz*, 834 F.3d at 765)).

Evidence of pretext – which "means a lie, specifically a phony reason for some action," *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015) – is evidence of discrimination. *See, e.g., Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation" and an employer's false explanation is "one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive" (emphasis

---

[2] Discrimination based on child-bearing capacity – which is based on an inherently gender-specific characteristic – is a recognized form of discrimination because of sex under Title VII. *Hall v. Nalco Co.*, 534 F.3d 644, 648 (7th Cir. 2008).

in original)); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (factfinder's disbelief of asserted reasons for action, especially if accompanied by suspicion of mendacity, may, when combined with a prima facie case, suffice to show intentional discrimination); *Joll*, 953 F.3d at 932 ("Employment discrimination law has long recognized that an employer's dishonest explanation of a decision can support an inference that its real reason was unlawful"); *Greengrass v. International Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015) ("Where, as here, there is a question of fact as to the believability of an employer's purported reasons for an employment decision … it suffices to defeat the employer's summary judgment motion"); *Coleman v. Donahoe*, 667 F.3d 835, 855 (7th Cir. 2012) (if any employer is dishonest about the reason for an adverse employment action, that dishonesty supports an interference that the real reason is discriminatory); *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) ("If the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden on may rationally be drawn").

There is an abundance of pretext evidence in this case from which a reasonable jury could conclude that the YMCA's articulated explanation for terminating Rehm's employment was phony and not the real reason.

 1.  The YMCA-GWC's purported reasons for terminating Rehm are vague,
 subjective generalizations that have no basis in specific fact.

"[A]n employer must articulate reasonably specific facts that explain how it formed its opinion." *EEOC v. Target Corp.*, 460 F.3d 946, 957 (7th Cir. 2006). A reasonable jury can find vague and subjective explanations – which have no basis in fact – to be pretextual. *See, e.g., EEOC v. Board of Regents of the Univ. of Wis. Sys.*, 2019 WL 5802546, at *4 (W.D. Wis. Nov. 7, 2019); *Hudson v. Lands' End Inc.*, 928 F.Supp.2d 1045, 1059 (W.D. Wis. 2013) ("A reasonable jury could … conclude that defendant's criticisms of plaintiff's performance are pretextual because

4

they were so vague"). Relying on vague, subjective explanations is even "more problematic when … the employer's reasons are so vague as to be almost impossible to rebut." *Board of Regents*, 2019 WL 5802546, at *4 (citing *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (finding of pretext supported by employer's failure to specify what the plaintiff did wrong); *Culver v. Gorman & Co.*, 416 F.3d 540, 548 (7th Cir. 2005) (finding of pretext supported by employer's reliance on unspecified "performance issues"); *Tennes v. Commonwealth of Mass., Dep't of Revenue*, 944 F.2d 372, 379 (7th Cir. 1991) (finding of pretext supported by employer's reliance on "vague" criticism of the employee unsupported by any particular occurrence). Here, the YMCA-GWC has failed to articulate specific reasons for firing Rehm that are based in fact.

In his deposition, Becker testified that in a four to six-week period, Rehm's job performance rapidly deteriorated (Becker Dep. at 92), and he articulated that deterioration as follows:

Q     … So in the four- to six-week period, what specifically did she do or not do that led you to conclude she lacked leadership, direction, and was not leading in a way commensurate with the VP role? What specifically led you to draw those conclusions in that four- to six-week period?

A     The concern from her direct reports that she was not providing them with the communication and direction that they needed. Her lack of physical presence. At times they had tried to reach her with no-call, no-show was the beginning of my concerns.

Q     Is that the extent of the specifics you can provide?

A     Then the concern came up over two other issues that expanded my concerns and my reasoning with Katie's continued work in the vice president role. One was specifically related to the strategic plan and deadlines that were not met, and the other was related to the lack of attendance at branch board meetings that Rehm was clearly expected to attend and had told branch leadership and Kristen Stoll, one of her direct reports, that she would be attending.

Q     Any other specifics that you can provide?

A    No.

(Becker Dep. at 93-94). Becker could not provide any specific incident when Rehm did not provide a direct report "with communication and direction" or when Rehm was unresponsive or unavailable to a direct report. Becker admitted that Rehm's direct reports did not raise a concern with Rehm directly to him. (Becker Dep. at 94). *See, e.g., Hudson*, 928 F.Supp.2d at 1049, 1050-51, 1051-52, and 1059 (concluding a reasonable jury could find pretext because the employer repeatedly failed to provide specific examples to support vague criticisms of the employee's job performance, e.g., how the employee was "struggling").

To support Becker's claim regarding Rehm's direct reports, the YMCA-GWC provides a declaration of one of Rehm's direct reports, Carley Hoelzel, but Hoelzel does not provide any specifics either. Contrary to Hoelzel's unsubstantiated declaration and creating a dispute of fact, Rehm's other direct reports – Kristen Stoll (Director of Financial Development), Hanna Misiak (Director of Healthy Living), and Emily Salas (Director of Marketing) – each testified that they had no problems getting assistance or responses from Rehm. *See* Pl.'s Facts ¶¶ 69-71.[3]

Becker's assertion regarding the strategic plan and deadlines not being met is patently false. Rehm was not directly responsible for any aspect of the strategic plan. Salas, Rehm's direct report, was responsible for the layout and design elements of the strategic plan and Salas met the deadlines she was provided by Becker and committee co-chair Laurie Schlitt. To the extent there was delay, it was caused by Becker who two months after getting the initial *content* draft from Stoll unilaterally decided to scrap the content and wording of the plan developed by the committee and

---

[3] The YMCA contends that the opinions of Rehm's other direct reports, as non-decision makers are irrelevant. (Def.'s Br. at 12-13). That makes no sense as then Hoelzel's opinion, on which the YMCA-GWC relies, is irrelevant. Moreover, the YMCA-GWC has placed the views of Rehm's direct reports at issue by claiming to have fired Rehm based on alleged "concern from her direct reports." (Becker Dep. at 93-94).

its co-chairs and instead copy word-for-word much of the language of another YMCA's strategic plan. *See* Pl.'s Facts ¶¶ 80-97.

Becker's additional assertion regarding Rehm's lack of attendance at January 2020 branch board meetings is also unworthy of belief. While it is true Rehm did not attend the meetings, Becker admitted in his deposition that he never told Rehm that she was expected to attend the meetings and she had not attended such meetings in the past. Nor did Becker articulate a new expectation that Rehm attend when he learned she did not attend a January 2020 branch board meeting. Finally, it is undisputed between Stoll and Rehm, who developed the plan for preparing for and presenting at the branch board meetings without Becker's involvement, that Stoll would attend and present and Rehm would attend as support if she were able. *See* Pl.'s Facts ¶¶ 44-62.

The YMCA-GWC also submits various declarations to support its repeated assertions that Rehm "missed, cancelled, and/or arrived late to meetings," that Rehm "never seemed to be around or available," and that Rehm and her team "did not follow through on completing tasks." But other than a Mukwonago branch board meeting on January 29, 2020, the YMCA-GWC does not cite any specific meeting that Rehm missed, cancelled, or to which she arrived late. *See, e.g.,* Mertens Dep. at 121 (unable to identify a single meeting that Rehm cancelled or rescheduled despite telling Jazwiecki on January 30, 2020 that Rehm did so); Daley Dep. at 65-68, 90 (unable to identify any meeting that she claims Rehm missed or "stood people up"). Nor does the YMCA-GWC cite any specific incident when Rehm was not available or failed to timely respond to a request. The sweeping repeated assertion that Rehm was "*never* around" could not possibly be true or Rehm would have been fired for being AWOL long before February 13, 2020, rather than given annual incentive bonuses praising her performance. Nor does the YMCA-GWC give any example of when Rehm and her team did not follow through on completing tasks or otherwise explain what

that means or what follow-up was necessary and not done. A reasonable jury can find such vague and subjective generalizations – which are unsupported by specific facts – to be made up and pretextual.

Furthermore, the declarants were not in a position to know that Rehm was "never around or available." They have not shown that they have personal knowledge as to where Rehm was or should have been at all times. Nor could they. The declarants worked in different locations and had different responsibilities. Rehm's job required her to attend many meetings and events at various YMCA-GWC sites and other locations. *See* Pl.'s Facts ¶¶ 9-12. Unless a witness with personal knowledge can point to a specific meeting that Rehm was expected to attend but did not show or was late or a time when Rehm should have been available but was not – and none of the declarants do! – a reasonable jury could find the declarants' speculative assertions to be meritless and pretextual. Statements in affidavits "that are the result of speculation or conjecture or merely conclusory do not meet" the requirements of Rule 56 of the Federal Rules of Civil Procedure. *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); Fed. R. Civ P. 56(c)(4) ("[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.") "While personal knowledge may include inferences and opinions, those inferences must be substantiated by specific facts." *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.,* 62 Fed.Appx. 122, 125 (7th Cir.2003); *Drake v. Minnesota Min. & Mfg. Co.* 134 F.3d 878, 887 (7th Cir.1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.")[4]

---

[4] The YMCA's proffered declarations are rife with speculation, opinions, and conclusions, unsubstantiated by specific facts and lack facts showing personal knowledge.

Additionally, if the assertions that Rehm was "never around," was "rarely seen," and "disregarded her job duties" were true, Becker would have known that. As of July 2019, they both had offices at the YMCA's New Berlin Center. Yet, Becker never asserts that Rehm was not available or not responsive. And if it were true that Rehm was "never around" and "never followed up," Rehm would not have been able to fulfill her significant job responsibilities. Yet, significantly, the YMCA-GWC does not make a single claim that Rehm ever failed to complete her work or fulfill her responsibilities. The absence of such facts – which does not square with allegedly not being around and disregarding duties – further calls into doubt Becker's asserted grounds for firing Rehm.

Also discrediting the YMCA-GWC's case, the declarations of Katy Groh (paragraph 4), Laurie Schlitt (paragraph 5), and Kathy Westpfahl (paragraph 5) each raise "weekly branch rotations each Tuesday." However, Becker unambiguously testified in his deposition that nothing about the Tuesday meetings initiated by Rehm factored into his decision to terminate Rehm's employment. (Becker Dep. at 254-255). Yet, the YMCA-GWC raised the Tuesday rotations in its submissions to the ERD and now again on summary judgment. Thus, even if those shifting assertions were not too vague to be considered legitimate, they are irrelevant as well as phony.

        2.    <u>Rehm's strong performance record, with no warning of any failure to meet expectations, calls into question the YMCA-GWC's explanation for firing her.</u>

Rehm's strong performance record further calls into question the YMCA's explanation for firing her. It is undisputed that Rehm received no performance evaluations or other feedback that her performance was sub-standard or that she was not meeting expectations. In fact, the feedback she received from Becker was positive, including in the weeks before her February 13, 2020 termination – i.e., Rehm's presentation at the December 12, 2019 staff rally and in her January 27,

2020 meeting with Becker in which he approved her team's 2020 performance goals and complimented her plan. *See* Pl.'s Facts ¶¶ 22, 24. She also received annual incentive bonuses for her performance in 2017, 2018, and 2019 – the last one on December 13, 2019, along with an email in which Becker wrote:

> I know it has been a challenging year, but your leadership and commitments to our organization stands [sic] strong. Our success is attributed to your operational and strategic initiatives and high standards that are set across the association. It is with these major accomplishments that I award you $1,500 year end incentive compensation.

*See* Pl.'s Facts ¶¶ 16, 17, 23. Additionally, in January 2019, when Rehm's co-Vice President of Operations Geoff Mertens was expected to be off work on extended family leave, Becker placed Rehm in charge of branch oversight – in addition to her already extensive responsibilities. He also placed the new Wellness Center in New Berlin which opened in June 2019 under her management. If Rehm was missing meetings, never around, and not following through, a jury could reason that Becker would not have placed her in those significant oversight roles. *See* Pl.'s Facts ¶¶ 19-21.

Presumably because he gave Rehm a 2019 incentive bonus and praised her 2019 performance on December 12, 2019, Becker claimed that Rehm's performance suddenly and rapidly deteriorated in January 2020. However, it makes no sense that after 20 years of dedication to the YMCA's mission and five successful years at the YMCA-GWC – including three as a VP of Operations – Rehm suddenly failed to perform her job. And it makes no sense that Becker – a seasoned executive – would not have raised Rehm's alleged failures and warned her that she was at risk of losing her job if that were truly the case. Yet, Becker admittedly never told Rehm before he fired her that her performance was unsatisfactory and needed improvement or that she was at risk of termination, even though he also admitted that nothing prevented him from giving her notice

of any concerns he had. (Becker Dep. at 109-110). That raises more suspicion about what really motivated Becker.

3. <u>Becker failed to articulate his reasons for firing Rehm at the termination meeting, even when pressed by Rehm to do so.</u>

Having received no indication that her performance was anything less than satisfactory or better, Rehm was shocked by her sudden firing so she pressed Becker several times in the termination meeting for the reasons. He stuck to his vague statement that she lacked the ability to conduct her job at the level commensurate of a vice president. He provided no specifics or incidents to back up that conclusion, even when Rehm kept asking what led to it. *See* Pl.'s Facts ¶¶ 30-34. The failure to mention later articulated grounds for a termination decision is evidence of pretext. *See Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634 (7th Cir 1996) (a jury could have concluded that an explanation was constructed post hoc given the employer's failure to express the explanation in response to the plaintiff's initial inquiry); *Culver*, 416 F.3d at 548, 549 (a decision-maker's failure to identify incidents cited as grounds for discharge when he fired the plaintiff and during his deposition is evidence of pretext).

4. <u>The YMCA-GWC has given shifting and inconsistent explanations for who made the decision to discharge Rehm and about the termination documentation.</u>

The YMCA-GWC has also shifted its story both as to who was involved in making the termination decision, how they were involved, and as to the reasons for the decision. This is further proof of pretext.

As to the decision-maker, Becker testified in his deposition that he "consulted" with Chief Financial Officer Linda Daley, Human Resources Director Laura Jazwiecki, and Association Board Chair Rick Andritsch in making the decision to terminate Rehm's employment; that "[i]t was a collective decision"; and that Jazwiecki and Daley "strongly felt that … [he] was in a

11

position to terminate, that there was no other action that should be considered." (Becker Dep. at 103, 111-112). However, Jazwiecki testified that she did not recall Becker asking for her opinion and stated only that she and Daley supported the decision *after* he told them he was firing Rehm by not "object[ing] to what he was saying" (Jazwiecki Dep. at 83-84). Daley testified that she expressed her agreement with the termination decision *after* Becker told her he had made the decision (Daley Dep. at 80-81). Andritsch testified that he first learned of Rehm's termination from Becker "[a]t a board meeting after it was completed, after it was done," and that he had no prior knowledge Becker was contemplating firing Rehm. (Andritsch Dep. at 24-26). Contradicting his own deposition testimony, in his declaration, Becker now asserts that he alone made the decision. (Becker Decl. ¶ 42).[5] *See Joll*, 953 F.3d at 933 (finding, as an indicator of pretext, fluctuating accounts about who was involved in the employment decision at issue); *EEOC v. C.G. Schmidt, Inc.*, 670 F.Supp.2d 858, 868-869 (E.D. Wis. 2009) (shifting statements about who made the termination decision and ever-changing rationales precluded summary judgment).

The YMCA-GWC's stories also conflict about the documents that Becker now states in his declaration that he reviewed and considered in making the termination decision. (Becker Decl. ¶¶ 34, 35, and 41). With respect to Jazwiecki's notes of her January 30, 2020 meeting with Mertens, Becker first testified that he did not know and could not explain why the notes were prepared other than it was "part of [h]is evaluation process." (Becker Dep. at 237-238). Jazwiecki testified that she met with Mertens and Schlitt on her own initiative and not at the direction of Becker. (Jazwiecki Dep. at 107, 131-132). Contrary to both Becker and Jazwiecki, Daley testified that

---

[5] Becker also testified in his deposition that "Rehm fired herself. I executed a termination." (Becker Dep. at 102).

Becker asked Jazwiecki – who reported to Daley – "to investigate some of the claims that were brought to him." (Daley Dep. at 55).

With regard to Daley's February 3, 2020 email, Becker testified that he did not ask Daley for the documentation to support a termination decision. (Becker Dep. at 223). Daley testified, to the contrary, that Becker "asked [her] to write down some complaints that [she] had made verbally to him about Katie's attendance and lack of presence." (Daley Dep. at 54). Daley then provided Becker (and Mertens and Jazwiecki) an email about a conversation she had with Emily Salas at a YMCA conference on July 18, 2019. Adding more to the inconsistency, Daley testified that Becker told her and Jazwiecki before firing Rehm that he had received complaints from Board Chair Andritsch about Rehm, but Andritsch disavowed making or knowing of any complaints about Rehm (Daley Dep. at 54, 57, 77, 82; Andritsch Dep. at 28 (testifying he was not aware of any complaints about Ms. Rehm's job performance)).

With respect to Mertens's February 3, 2020 "Documentation" email, Becker testified that he did not ask Mertens directly or through Jazwiecki to get information from Stoll and that he does not know why Mertens did so. (Becker Dep. at 248-250, 252). Mertens testified that Jazwiecki asked him to prepare the email. (Mertens Dep. at 47-48). Jazwiecki testified, at odds with Mertens, that she did not know why Mertens sent her his February 3, 2020 email; that she never directed Mertens to get any information on Rehm; and that she did not know who directed Mertens to get the "more information" Mertens refers to in his email. (Jazwiecki Dep. at 143-144). Despite creating "Documentation" used to justify the termination of a peer, Mertens claimed that he could not recall why he was getting information on the past 30 days as he stated in his email. (Mertens Dep. at 69).

13

This "who's on first" finger-pointing would be comical if it did not result in the loss of Rehm's job and her 20-year YMCA career. They all cannot be telling the truth; some or all of them are lying. However the documentation came about, the timing (within days of Rehm's firing) and description of it (i.e., "documentation") also indicates an effort to manufacture and document *after the fact* grounds for a decision to discharge Rehm.

     5.      <u>The YMCA-GWC made inconsistent and untruthful statements to the government agency that investigated Rehm's discrimination claims.</u>

The YMCA-GWC also made inconsistent and untruthful statements to the government agency that investigated Rehm's claims. This is also evidence of pretext from which a jury may infer intentional discrimination. *See Baines v. Walgreen Co.*, 863 F.3d 656, 663 (7th Cir. 2017) (the employer's inconsistent response to the EEOC, which was evidence of untruthfulness, supported a reasonable inference of unlawful intent).

The YMCA-GWC told the ERD that Rehm had a problem with "chronic absenteeism" and a "pattern of absenteeism" as grounds for her termination. (Lindner Decl. ¶ 2, Ex. A, pp. 1, 3, 5, 10). However, the YMCA-GWC cannot provide any specific facts that show Rehm chronically missed work, let alone that she had any absences that were not covered by her vacation or sick time or otherwise approved.

The YMCA referred the ERD to "an elaborate schedule for Tuesdays" as its *first* support for its charge that Rehm missed meetings. (Lindner Decl. Ex. A, p. 3). In its Proposed Facts to the Court, the YMCA-GWC asserts that "Rehm and/or her team members sometimes missed, cancelled, and/or arrived late … to branch rotation meetings." (Def.'s Facts ¶ 32). However, as stated above, when asked in his deposition whether anything about the Tuesday branch rotation meetings factored in his decision to terminate Rehm, Becker unequivocally answered, "No."

(Becker Dep. at 254-255). Such shifting explanations preclude summary judgment. *Hitchcock*, 718 F.3d at 738.

The YMCA-GWC made grossly untrue statements to the ERD regarding the strategic planning process, which it told the ERD was "independent grounds for termination" of Rehm's employment. (Lindner Decl. Ex. B, p. 7). The YMCA-GWC first told the ERD that the marketing department overseen by Rehm "missed multiple internal deadlines to provide a draft of the marketing piece to the Board;" "[t]he Board repeatedly asked Mr. Becker about the process of the marketing piece;" "[t]he Marketing department did not complete an acceptable first draft (originally due in December 2019) until after Ms. Rehm's termination on February 13, 2020," which "show[ed] a brazen lack of leadership on Ms. Rehm's part." (Lindner Decl. Ex. A, p. 4). The YMCA-GWC doubled-down on these falsehoods in a second submission to the ERD, representing:

> The Board expected a draft of the Strategic Plan by the end of 2019. Mr. Andritsch held this expectation, Mr. Becker held this expectation, Ms. Schlitt and Ms. Brown held this expectation and, importantly, this expectation was communicated to Ms. Rehm and her marketing director, Emily Salas. It became clear to Mr. Becker in early January 2020 that Ms. Rehm's team had done very little work on their marketing piece. This put Mr. Becker in the awkward situation of telling the Board that they did not have a draft to review as expected…. [T]his is another example of Ms. Rehm, charged with the development of the marketing piece, failing to take accountability of her team's shortcomings. As a result of this delay, Mr. Becker indicated to Board leadership that they would receive a draft prior to the March 3, 2020 Strategic Plan committee meetings. Mr. Andritsch emphasized to Mr. Becker that he needed to produce a draft of the Strategic Plan by the end of January 2020 to provide enough time for evaluation and revisions. Again, this expectation was clearly communicated to Ms. Rehm.
>
> In late January, Mr. Becker checked in with Ms. Rehm and her marketing team to monitor progress. A draft was not complete. Having lost confidence in Ms. Rehm, and knowing he held the responsibility to present the draft of the Strategic Plan to the Board, Mr. Becker worked with Ms. Schlitt and Ms. Salas directly to produce a draft marketing piece… Mr. Becker adjusted the layout for presentation purposes; he did not change content (which had been the subject of months of discussion and development).

(Lindner Decl. Ex. B, pp. 7-8).  The deposition testimony of Andritsch, Salas, Stoll, and Rehm, as well as the email communication among those involved in drafting the content and layout of the plan, all squarely contradict those assertions.  *See* Pl.'s Facts ¶¶ 80-97 and the cited record evidence for proof that the YMCA-GWC's representations  to the government are false.  The evidence shows:

- Board Chair Andritsch did not "emphasize[] to Mr. Becker that he needed to produce a draft of the Strategy Plan by the end of January 2020 to provide enough time for evaluation and revisions."  Rather, Andritsch testified that he wanted the strategic plan finished by the end of his first board chair year (i.e., May 2020), and that he did not give any deadline that Becker or his staff missed.  (Andritsch Dep. at 51, 57-58, 72-73).  Becker testified, however, "Rick Andritsch had asked that a draft of the strategic plan be completed by the end of December [2019]," that Becker "was getting pressure from Rick Andritsch to have this done," and that Becker "had to stall Mr. Andritsch's expectations," for which Becker blamed Rehm.  (Becker Dep. at 154, 160-161).  One of them is not telling the truth.

- Becker also testified that Andritsch was involved in reviewing and providing content for drafts of the strategic plan (Becker Dep. at 167, 173), but Andritsch testified that he did not see any interim drafts, only the final product.  (Andritsch Dep. at 68).  Again, one of them is not telling the truth.

- Despite this testimony, when pressed, Becker did not identify in his deposition a deadline communicated to Rehm and that she or Salas missed, and the email communication concerning the progress on the content and layout of the strategic plan (i.e., the marketing piece) contradicts the accusation of missed deadlines and, to the contrary, shows delay on Becker's part.

*See* Pl.'s Facts ¶¶ 88-97. Furthermore, Becker admitted that Salas met "the mid-January deadline that [he] gave her after the year end had passed." (Becker Dep. at 175).

- Salas testified that when she, as the YMCA-GWC's Marketing Director, was brought into the strategic planning process to put the content of the plan into a layout and design, Becker gave a deadline of February 3, 2020. Salas met that initial deadline and subsequent deadlines, even according to Becker. Salas testified and email communication supports that Becker changed the content or words of the plan (copying wording from the YMCA Boston plan) from what she was given; he did not change her design/layout work. *See* Pl.'s Facts ¶¶ 90-92.

Given what was revealed in discovery in this action, the YMCA-GWC now backs significantly off from what it told the ERD about the strategic plan in seeking summary judgment. It now says only that "Becker also considered his recent frustrations working on the YMCA-GWC's Strategic Plan for 2020-2022 … when evaluating Rehm's performance" and that "[i]t was Becker's expectation that Rehm would be responsible for developing the marketing pieces of the Strategic Plan and that her team would meet Becker's deadlines." (Def.'s Facts ¶¶ 83, 85). Notwithstanding these watered-down accusations, the YMCA-GWC still has no evidence that there was any deficiency in the development of the "marketing pieces," let alone any deficiency for which Rehm was responsible. While the YMCA then asserts that the "Strategic Plan was not completed and submitted to the Board until after Rehm was terminated," it provides no facts establishing that Rehm or Salas failed to complete the marketing work in a timely manner. Moreover, the March 3 deadline for getting a final draft to the strategic plan committee (before the plan document was to be presented to the Board) – which was met – occurred *after* Rehm's February 13, 2020 firing.

As further evidence of its phoniness, the YMCA-GWC's claim that Rehm's performance with respect to the Strategic Plan was grounds for her firing was not in any of the "documentation" created by Jazwiecki, Daley, or Mertens. Nor was it mentioned by Becker in the termination meeting. Rather, the YMCA-GWC made it up as a basis for termination in its submissions to ERD to persuade the investigator to find its favor (without apparently reviewing its own contradictory email messages or talking to those actually involved in the process). *See Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 291 (7th Cir. 1999) (that the employer changed its story between the time of the state administrative proceeding and the federal action is evidence of pretext and entitled the plaintiff to a trial on the issue of the reason for his termination).[6]

6. <u>The YMCA-GWC dredged up outdated alleged performance issues to manufacture grounds to discharge Rehm.</u>

As further proof of the YMCA-GWC's efforts to manufacture reasons to fire Rehm, it dredged up outdated alleged performance issues. In his declaration, Gary Sievewright accuses Rehm of missing or being late for *again unspecified* meetings when she was the Executive Director of the Southwest branch, a responsibility Rehm no longer held after November 2018. Sievewright asserts that an unidentified board member told him that Rehm's failure to attend unspecified meetings was a reason for the person's departure from the board. However, in Mertens's triple-hearsay February 3, 2020 "Documentation" email about what Jake Wilson purportedly told him about what Sievewright purportedly told Wilson, Mertens says that an unidentified potential board member stated he or she would not join the board (not quit the board) because Rehm purportedly missed an unspecified meeting. Again, the YMCA-GWC cannot get its story straight. Regardless, if these matters had occurred and were serious enough to warrant termination, they would have

---

[6] Becker and Jazwiecki both reviewed the YMCA-GWC's July 10, 2020 and October 16, 2020 submissions to the ERD before they were submitted. (Becker Dep. at 255-256; Jazwiecki Dep. at 214-215). Thus, the YMCA-GWC cannot claim that the submissions were somehow erroneous.

been addressed long before February 13, 2020 and would not have resulted in Becker awarding Rehm the same annual incentive bonuses as Mertens.

Likewise, what Mertens reported to Jazwiecki on January 30, 2020 regarding Mike Jakubowski and Austin, who held positions at the Southwest branch, also occurred years before Rehm's termination when she was the branch's executive director. (Mertens Dep. at 118-120, 123-124). Mertens also reported in his February 3, 2020 email to Becker, Jazwiecki, and Daley, that he heard from Aaron Miller, who heard from Aaron Schmidt that in the summer of 2019 (when Rehm was working on the new Wellness Center placed under her management and covering for the absent Mertens), Rehm did not attend "YPN board meetings." (Mertens Dep. at 93-95, Ex. 5). However, Rehm was not on the board at the time and it is a volunteer role, not a job expectation. (Becker Dep. at 253-254). That Mertens went to great lengths to dredge up dirt on Rehm from second and third-hand sources relating to inconsequential matters years ago that he reported to Becker, Jazwiecki, and Daley further establishes that it is reasonable to infer that the grounds and documents on which Becker purportedly based his decision to terminate Rehm's employment are not true, did not honestly motivate his decision, and were part of an effort to manufacture post hoc grounds to fire Rehm.

The YMCA-GWC also attempts to justify its firing of Rehm by pointing to what Salas vented to Daley about during a July 2019 conference. Both Daley and Becker both claim that Daley told Becker of Salas's venting shortly after the conference but Becker never asked Salas about her concerns, told Rehm about them, or took any action based on them. *See* Pl.'s Facts ¶¶ 76, 78. Becker knew from discussions with Rehm that Salas's complaints about Hoelzel's management of the New Berlin Wellness Center were valid and he had discussed a potential replacement of Hoelzel with Rehm if Hoelzel's management of the Center did not improve. *See*

Pl.'s Facts ¶¶ 64-65 . Months later, on December 13, 2019, Becker gave Rehm an incentive bonus and praise for her 2019 job performance. Salas had no problems with Rehm after she discussed her concerns with Rehm; Sales reported no other problems with Rehm; nor was Salas asked by Becker if her concerns had been addressed. *See* Pl.'s Facts ¶¶ 75, 78. That Becker never raised Salas's venting to Rehm; never followed up with Salas to see if what she vented about continued; and awarded Rehm a bonus and praise for her job performance months later calls into question whether Becker honestly believed Salas's July 2019 complaints warranted Rehm's termination more than six months later in February 2020.

Moreover, as noted above, Becker testified that his decision to fire Rehm was based on a "rapid deterioration" in her job performance in a four to six-week period before February 13, 2020. Yet, the YMCA-GWC presents Sievewright's Declaration about unspecified incidents well outside that period, claims that Becker relied on "Documentation" from Mertens resurrecting vague alleged incidents at the Southwest Branch that occurred years ago, and cites Salas's resolved venting about Rehm and her management of Hoelzel (the Director of the New Berlin Wellness Center) six months earlier. That is inconsistent with Becker's testimony about the four-to-six period of deterioration and his December 13, 2019 praiseworthy email and bonus to Rehm, and further calls into doubt the real reasons for Rehm's sudden, unexplained-to-her discharge.

7. <u>Becker lied and changed his testimony on other matters he claims related to Rehm's termination.</u>

In addition to the above, Becker was untruthful in his deposition and changed his testimony when confronted with email messages that contradicted his sworn testimony on other matters he claims related to his firing of Rehm. Becker initially testified that the content he provided to Salas and Laurie Schlitt on January 28, 2020 for the YMCA-GWC's strategic plan was content developed by the many hours of work put in by the committee members:

20

> Q   Where did you get the content that you attached to your email and sent to Ms. Salas and Ms. Schlitt?
> A   From my various notes throughout the multiple months of committee work.
> Q   That was the sole source?
> A   Yes.
>         . . .
> A   This was the wording of the committee as it was developed and notes that I had taken throughout the process.

(Becker Dep. at 189-190).  *See also* Becker Dep. at 146 (Q:  It was the committee that came up with the content for the plan:  the goals, the initiatives?  A:  Yes, absolutely).  But when confronted with the fact that the revised content he gave Salas was largely word-for-word what is contained in a strategic plan of the Boston YMCA, Becker changed his testimony and admitted that he significantly copied the content of the Boston plan.  (Becker Dep. at 192-193).

    With regard to his blame of Rehm regarding January 2020 branch board meetings, which Becker did not attend, Becker testified in his deposition that Stoll was concerned that Rehm did not show for the meetings, that Stoll "was left to present on her own," and that Stoll "had to scramble at the last minute to present some of the material that Rehm was going to", that Stoll "had to . . . create some content on the fly," and that branch executive directors "needed to assist her."  (Becker Dep. at 101, 208-209, 213).  Stoll, who actually attended the meetings, however, squarely and emphatically contradicted Becker.  Stoll testified that she worked with Rehm on the 2020 campaign materials which were ready for the meetings and that she did not have to create any content on the fly; that she was very prepared to give her presentations on the campaign; that Rehm's non-presence did not impact her ability to deliver the presentations; and she never received any negative feedback on her presentations.  (Stoll Dep. at 69-70, 79-81).  Furthermore, when he was asked whether there was anything specific that Stoll was not able to present or cover at any of the branch board meetings, Becker testified, "I do not know because I was not there."  (Becker Dep. at 210).  Additionally, what Mertens reported to Becker about an alleged conversation he had

with Stoll was also inaccurate and contradicted by Stoll. *See* Pl.'s Facts ¶¶ 58-61. "When an employer offers differing explanations regarding an adverse employment action, and when evidence has been presented that allows a reasonable trier of fact to disbelieve each explanation, a jury may reasonably infer that the employer is 'hiding something that – that is, that the true explanation is unlawful discrimination.'" *C.G. Schmidt, Inc.*, 670 F.Supp.2d at 867 (quoting *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1024 (8th Cir. 1998)).

In sum, there is substantial evidence that the YMCA-GWC is dissembling to cover up a discriminatory motive. Rehm has identified numerous "weaknesses, implausibilities, [and] contradictions" in the YMCA-GWC's explanation for Rehm's discharge such that a reasonable person could find it unworthy of belief – and, with the benefit of discovery, substantially more evidence of pretext than the Court found was enough to deny the YMCA-GWC's Partial Motion to Dismiss Rehm's gender-based wrongful termination claim. (Dkt. 17, pp. 11-12). *Coleman*, 667 F.3d at 852. Thus, a jury trial is required to resolve the claim.

**B. There Is Also Evidence Pointing To A Gender-Based Motivation.**

Although, based on the Supreme Court and Seventh Circuit authority cited above, it is not necessary for Rehm to present evidence of a discriminatory motive to defeat summary judgment given the extensive pretext evidence in the record, there is evidence from which it can be reasonably inferred that Rehm's sex and child-bearing capacity was a motivating factor. There is evidence that Becker treated Mertens – Rehm's male co-VP of Operations –more favorably than Rehm. There is also evidence that Becker harbored animus toward pregnant employees on Rehm's team.

When Becker promoted Rehm and Mertens both from branch executive director positions to Vice Presidents of Operations, he paid Mertens – her male peer – a salary of $2,000 more. When

Rehm complained about the pay disparity, Becker adjusted her pay (but not to full parity). That Becker increased Rehm's pay in response to Rehm's complaint is an indication that the difference could not be justified by legitimate reasons.

Mertens was also treated more favorably with respect to time off from work. He was allowed to take family leave for many months in 2019 and receive his full pay. But when Rehm took time off or adjusted her schedule for family-related reasons – i.e., to conceive a child through IVF and to help her family when her grandmother died – she was accused of "absenteeism" and of "missing meetings."

Becker also made anti-pregnancy comments, one of which he admits. When two members of Rehm's team were pregnant, Becker commented in Rehm's presence about "changing the water" and that "no one else on [Rehm's] team is allowed to get pregnant." At the time, Becker knew of Rehm's efforts to bear a child. When Becker found out Misiak was pregnant with her second child, he commented, "No more" or "You can't have any more," or something to that effect. *See* Pl.'s Facts ¶¶ 41-43. These are not irrelevant "stray remarks." Becker made the decision to terminate Rehm's employment and he made these anti-pregnancy remarks when he knew she was trying to get pregnant and within two months of firing her. "A remark or action by a decision-maker reflecting unlawful animus may be evidence of his or attitudes more generally." *Joll*, 953 F.3d at 935. *See also Hitchcock*, 718 F.3d at 740-741 (comments to the plaintiff and her coworker could have been interpreted by a reasonable jury as animus toward pregnant women, even if they could also be interpreted as an innocent joke and are circumstantial evidence of pregnancy discrimination). Furthermore, after Rehm told Becker on January 27, 2020 of her third IVF attempt and her hope for success using an egg donor, Becker and his team went into action. Jazwiecki spoke to Schlitt on January 30, 2020 and Mertens on January 31, 2020; Daley sent her email on

February 3, 2020, and Mertens sent his "Documentation" email on February 3, 2020 and another email on February 10, 2020. The suspicious timing of these actions points directly to discrimination based on Rehm's child-bearing capacity.

Becker's response to Rehm's announcement of her successful pregnancy at the end of the termination meeting is also evidence of Becker's attitude toward pregnancy. Becker did not congratulate Rehm, knowing of her extensive efforts to conceive a child, or otherwise acknowledge her pregnancy. His silence also supports an inference of animus toward her Rehm's child-bearing efforts and pregnancy.[7]

The above evidence of more favorable treatment of Rehm's male peer and Becker's anti-pregnancy expressions further precludes summary judgment in the YMCA-GWC's favor on Rehm's gender-based wrongful termination claim.

## II.    THE COURT CANNOT GRANT SUMMARY JUDGMENT ON REHM'S TITLE VII GENDER-BASED PAY DISCRIMINATION CLAIM.

In her first cause of action, Rehm claims the YMCA-GWC paid her less than her male peer (Mertens) because of her gender in violation of Title VII. Title VII also makes it unlawful for an employer to discrimination against an employee with respect to her compensation because of her sex. 42 U.S.C. § 2000e-2(a)(1); *Kellogg v. Ball State Univ.*, 984 F.3d 525, 528 (7th Cir. 2021). The disparity in pay between Rehm and Mertens is relatively small, but nonetheless a disparity that offended Rehm and caused her to complain to Becker about it. There is also evidence that calls into question whether Becker's explanation for the pay disparity was the real reason.

Becker promoted Rehm and Mertens to VP of Operations positions at the same time from branch executive director positions. Both had significant YMCA tenures and years of YMCA

---

[7] That Becker refused to refund Rehm's donation of $1,500 to the YMCA-GWC the week before her firing is further evidence of animus toward her. *See* Pl.'s Facts ¶¶ 39-40.

management experience at the time of their promotions. Due to the growth of the YMCA-GWC, Becker felt two employees were needed to manage the Association's operations and he divided operational responsibility between them. (Becker Dep. at 13-16). Becker placed Rehm in charge of four unique and specialized functions servicing all branches (marketing, financial development, membership, and healthy living) and she remained an executive director of one branch. Becker placed Mertens in charge of overseeing the branches, each of whom had their own executive running branches, and he remained an executive director of one branch. Both Rehm and Mertens were on the YMCA-GWC's Administration Team with Becker and Daley. *See* Pl.'s Facts ¶¶ 4-5.

Becker claims that he paid Mertens more than Rehm when he promoted them because (1) Mertens had more education than Rehm (a master's degree), (2) he had worked for Becker 2.5 years longer than Rehm, and (3) Mertens's job was more "complex and challenging." (Becker Dep. at 30-31). However, Becker could not explain the correlation between these factors and the $2,000 pay difference. (Becker Dep. at 30-31, 35-36). Becker even denied there was a correlation between Merten's master's degree and the VP of Operations job (Becker Dep. at 35), which is enough to call into question his explanation for the salary disparity.

There is also reason to question to the two other alleged factors. At the time of their promotions, as branch executive directors, both Rehm and Mertens were receiving salaries of $80,000, an indication that Mertens's greater education and work years for Becker were not relevant. (Pl.'s Facts ¶ 13). Additionally, if Mertens' VP of Operations position were truly more "complex and challenging," one would expect him to also be rewarded with higher incentive bonuses but he was not. Both Rehm and Mertens received the same bonuses when they were both in VP Operations positions.

Furthermore, if the three factors Becker articulated truly justified a pay difference, one would expect a larger difference than what the YMCA-GWC repeatedly refers to as a "nominal" one. In other words, the relatively small pay difference (about two percent) indicates that the jobs are relatively equal, not that there is a material difference. As the Seventh Circuit has explained, "[t]he smaller the differential, the more likely it is to be justified by a small difference in the work." *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771 (7th Cir 2007). However, the YMCA-GWC does not assert a "small difference in work" justification for the pay difference.

Becker's articulated reasons for the pay disparity are further called into question by the fact that Becker gave Rehm a greater salary increase – although not to parity – in 2018 when she complained about the disparity. That Becker increased Rehm's salary indicates that her prior salary could not be validated by the factors he claimed. Otherwise, he should have held firm on those factors and not adjusted Rehm's pay. Instead, Becker testified he gave Rehm a larger salary increase to keep Rehm "positive" and "supportive" of the organization. (Becker Dep. at 38-41). Thus, the even smaller pay difference that existed in Rehm's and Mertens's pay after the adjustment was no longer justified by any legitimate factor.

Additionally, in 2019, Becker gave Rehm some of Mertens's leadership responsibilities when he was on family care leave as well as responsibility for managing the new Wellness Center in New Berlin, but he did not adjust her pay further to reflect those additional responsibilities.

Based on these facts – that the salary disparity was relatively small and not explained by the articulated factors; that Becker gave Mertens and Rehm the same incentive bonuses; that Becker adjusted Rehm's salary closer to parity when she complained; and that Becker continued to pay Mertens more in 2019 when Rehm took on some of Mertens's responsibility during his months of leave as well as management of a new center – a jury could reasonably question

Becker's articulated reasons for paying Mertens a higher salary than Rehm when he promoted them and for continuing to do so after she complained and he adjusted her salary but not to parity. Accordingly, Rehm is entitled to a jury trial on her Title VII pay discrimination claim and summary judgment must be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court must deny the YMCA-GWC's motion for summary judgment on Rehm's first and third causes of action – her Title VII claims of gender-based termination and pay discrimination.

Rehm does not oppose the YMCA-GWC's motion with respect to her second (Equal Pay Act claim) and her fourth and fifth (retaliation) causes of action, and hereby waives those claims.

Dated: March 31, 2022   Respectfully submitted,
         By: s/ Laura A. Lindner
         Attorney Bar Number: 1021506
         ***Attorney for Plaintiff***
         Lindner Law, LLC
         648 N. Plankinton Ave. – Suite 418
         Milwaukee, WI 53203
         Telephone: (414) 409-1242
         Fax: (414) 271-7760
         Email: laura@lindnerlawllc.com