UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KATHERINE M. REHM,

        Plaintiff,

                                     Case No. 21-cv-237-pp

   v.

YOUNG MENS CHRISTIAN ASSOCIATION
OF GREATER WAUKESHA COUNTY, INC.,

        Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 20)**

The plaintiff filed a complaint against her former employer, YMCA of Greater Waukesha County, Inc. (YMCA-GWC), alleging violations of Title VII of the Civil Rights Act of 1964 (Title VII) and the Equal Pay Act (EPA). Dkt. No. 1. The plaintiff alleged that she had received unequal pay based on her gender in violation of both Title VII and the EPA, that she was wrongfully terminated based on her gender and child-bearing capacity in violation of Title VII and that the defendant had retaliated against her in violation of both Title VII and the EPA. Id. at 11–14.

The defendant filed a motion seeking summary judgment on all five of the plaintiff's claims. Dkt. No. 20. In her response, the plaintiff waived her claims for unequal pay under the EPA, retaliation in violation of Title VII and retaliation in violation of the EPA, dkt. no. 35 at 27, leaving the court to determine whether the plaintiff's Title VII claims for unequal pay and wrongful

1

termination survive summary judgment. The court will grant summary judgment on the unequal pay claim and deny summary judgment on the wrongful termination claim.

## I. Background

### A. The Parties

The defendant provides youth development, healthy living, and social responsibility programs at multiple branch locations. Dkt. No. 41 at ¶1. During the plaintiff's employment with the defendant, the defendant ran five primary branches: Waukesha, Mukwonago, West Suburban, Tri County and Southwest. Id. at ¶3. In 2019, the defendant opened an additional branch in New Berlin to house its administrative offices and a wellness center. Id. Other than the New Berlin branch, each branch employed approximately 150 to 300 employees, operated sixteen departments, had a multi-million-dollar operating budget and saw an average of over 1,000 visitors per day. Id. at ¶4. The New Berlin branch employed around five to ten staff. Id. at ¶5. The defendant has an association board of directors and boards for each full branch, made up of volunteers who are focused on fundraising and advancing the defendant's mission in the community. Id. at ¶7. Each branch normally has its own executive director responsible for managing the branch's day-to-day operations, including supervising the program staff and working closely with the local branch board. Id. at ¶6.

From October 2003 to November 2011, the plaintiff held various management positions for YMCA associations in the greater Chicago and

greater Indianapolis regions. Dkt. No. 46 at ¶1. In November 2011, the plaintiff became the executive director of the Southwest branch of the YMCA of Metropolitan Milwaukee. Id. at ¶2. She retained this position until the defendant acquired the Southwest branch in October 2014. Id. at ¶3.

B.    The Vice President of Operations Positions

In 2016, the defendant's CEO, Chris Becker, created two new Vice President of Operations positions in response to a growth in operations, membership and financial needs. Dkt. No. 41 at ¶8. Becker created one of the positions primarily for branch oversight, with job responsibilities including directly supervising branch executive directors, helping manage the branches, managing and preparing operating budgets, resolving membership issues, managing personnel, development of the branch board and community engagement. Id. at ¶10. Becker created the second VP of Operations position as a "more strategic and administrative role," with a focus on administrative oversight of membership, marketing, financial development and healthy living. Id. at ¶11. This second position oversaw a smaller group of staff. Id.

Becker promoted Geoff Mertens and the plaintiff to the two VP of Operations positions, with Mertens taking the position focused on branch oversight and the plaintiff assuming the position focused on administrative oversight of membership, marketing, financial development and healthy living. Id. at ¶¶12–13. Both Mertens and the plaintiff began their new roles on December 1, 2016, reporting directly to Becker. Id. at ¶¶12–14.

3

Mertens's primary responsibility was to oversee or supervise the various branches, which included: (1) directly supervising branch executives, (2) supervising multiple YMCA-GWC "cabinets" across the branches (groups of various program directors, *e.g.*, aquatics cabinet); (3) preparing and managing multi-million-dollar operating budgets (including an approximately $18 million operating budget in 2019); (4) resolving complex and/or escalated issues with YMCA-GWC members; (5) board development and community engagement; (6) managing and helping resolve personnel issues; and (7) other job duties as assigned by CEO Becker. Id. at ¶28. Typically, Mertens would visit each of his branches once per week, holding one-on-one meetings with his direct reports, touring the facility, meeting with program directors and providing other assistance and guidance as needed. Id. at ¶29.

The plaintiff initially oversaw the defendant's Southwest branch (where she had served as the Executive Director) and four school-age sites. Dkt. No. 41 at ¶25. But in 2018, Mertens took over responsibility for the Southwest branch, including the four school-age sites, to allow the plaintiff to focus on her administrative job duties, including association-level marketing, membership, financial development and healthy living. Id.

Although the parties agree that the VP positions had differing responsibilities, the parties dispute the extent to which these positions differed from each other. The defendant contends that the two roles were intended to be "very different positions, requiring different skills, efforts, responsibilities, and working conditions," dkt. no. 29 at ¶10, while the plaintiff asserts that both

4

positions "required similar skill sets, including leadership, communication, and financial management skills," dkt. no. 37 at ¶9.

C.     The Plaintiff's Salary Concerns

In October 2018, nearly two years after assuming the VP role, the plaintiff expressed concerns to Becker that Mertens was earning a higher salary than she. Dkt. No. 41 at ¶92. Becker responded by giving the plaintiff a four percent annual merit increase for 2018 rather than her scheduled three percent salary increase. Id. at ¶96. The plaintiff never brought up her salary concerns with Becker or anyone else throughout the remainder of her employment. Id. at ¶97.

There is no dispute that the defendant paid the plaintiff a lower salary than it paid Mertens in their respective VP roles. In 2017, the plaintiff received a base salary of $88,000 with a year-end bonus of $2,000, while Mertens received a base salary of $90,000 with a year-end bonus of $2,000. Id. at ¶21. In 2018, the plaintiff received a base salary of $96,123 and a year-end bonus of $3,000, whereas Mertens received a base salary of $98,000 and a year-end bonus of $3,000. Id. And in 2019, the plaintiff received a base salary of $100,374 and year-end bonus of $1,500, while Mertens received a base salary of $101,741 with a year-end bonus of $1,500. Id.

D.     The Plaintiff's IVF Treatment and Becker's Pregnancy Comments

In April 2019, the plaintiff began invitro fertilization treatment to conceive a child. Dkt. No. 41 at ¶103. One month later, the plaintiff revealed to Becker that she had undergone the procedure but had failed to conceive. Id. at

5

¶104. On approximately three occasions during the plaintiff's IVF treatment, Becker granted the plaintiff's requests to work remotely. Dkt. No. 41 at ¶105. In July 2019, Becker allowed the plaintiff to skip an out-of-state conference so that she could remain close to home during her IVF treatment. Id. at ¶106. In December 2019, the plaintiff informed Becker that she and her husband had decided to use an egg donor and that she would be undergoing another procedure in January 2020. Id. at ¶107.

In December 2019, while in an office suite occupied by the plaintiff and her team (a team that included two pregnant employees), Becker commented in reference to the pregnancies that he was "going to have to change the water in here." Dkt. No. 46 at ¶38. At an off-site employee meeting on December 12, 2019, while in the presence of the plaintiff, Becker stated "[n]o one else on [the plaintiff's] team is allowed to get pregnant." Id. at ¶39. The plaintiff did not discuss her IVF treatment with Becker again until around January 27, 2020, when she notified Becker that she was having a "procedure" the next day. Id. at ¶108. This was the last time Becker and the plaintiff discussed the plaintiff's IVF treatment. Id. at ¶109.

E.    The Plaintiff's Performance Issues

The defendant contends that following the plaintiff's January 27, 2020 meeting with Becker, Becker received complaints from other employees regarding the plaintiff's work performance. Dkt. No. 41 at ¶81. On or around January 31, 2020, Laura Jazwiecki, the defendant's Human Resources Director, met with Mertens to "gather and document information regarding

6

reported concerns he had shared regarding [the plaintiff]." Dkt. No. 24 at ¶8. Jazwiecki captured the conversation in meeting notes she shared with Becker. Id. at ¶¶8–11; Dkt. No. 24-2. According to the meeting notes, Mertens explained that other employees had reported to him that over the last month the plaintiff had failed to show up or call in to or had otherwise canceled meetings, to the point where it had become a running joke that "she won't be there." Dkt. No. 24-2. Mertens also reported to Jazwiecki that in January 2020, the plaintiff had failed to show up to planning meetings prior to board meetings. Id. Mertens explained that he had heard the plaintiff worked from home and spent little time on work. Id.

On or around January 31, 2020, Jazwiecki met with Mukwonago branch Executive Director Laurie Schlitt to discuss Schlitt's concerns with the plaintiff's work performance. Dkt. No. 41 at ¶74. Jazwiecki memorialized the conversation in her meeting notes, which she shared with Becker. Dkt. No. 24 at ¶7; Dkt. No. 24-1. According to the notes, Schlitt explained that the plaintiff had failed to attend a January 29, 2020 board meeting at which she was supposed to be presenting and that while the plaintiff continued to work hard on "mission advancement," she never was at work and was not leading. Dkt. No. 24-2 at 2. Schlitt told Jazwiecki that her confidence in the plaintiff was "lacking." Id.

Mertens also gathered information concerning the plaintiff's performance issues. See Dkt. No. 25-2. On February 3, 2020, Mertens sent an email to Becker, Jazwiecki and Linda Daley, the defendant's CFO, explaining that he

"got more information on the past 30 days." Id. Mertens wrote, "Kristen told me that [the plaintiff] scheduled meetings with each exec roughly 1-2 weeks in advance (early January) and only attended two of the meetings, after each one was canceled and rescheduled." Id. Mertens conveyed that the plaintiff did not attend any of the January 5 branch board meetings because she was "sick or had an appointment." Id. The plaintiff also failed to attend a board meeting on January 30, 2020, texting another employee that her grandmother had passed away that morning. Id. In early February, New Berlin Wellness Center Operations Director Carley Hoelzel informed Mertens that she had several questions she needed answered but did not ask the plaintiff (who was her supervisor) because "she did not get support or answers" and felt like she was "on an island." Dkt. No. 25 at ¶8; Dkt. No. 25-1. Mertens reported these concerns in an email sent to Jazwiecki on February 10, 2020. Dkt. No. 25-1.

F.     The Plaintiff's Termination

On February 13, 2020, Becker, along with Daley and Jazwiecki, met with the plaintiff to terminate her employment. Dkt No. 41 at ¶90. The parties dispute the precise reasoning given to the plaintiff during that meeting. The defendant argues that Becker, Daley and Jazwiecki met with the plaintiff and notified her that they were terminating her employment due to her lack of leadership, missed meetings and failure to make herself available to staff. Id. The plaintiff maintains that Becker informed her she was being terminated for her inability to conduct her job at the commensurate level of a vice president and that the defendant was not getting what it needed from the plaintiff, but

8

that he did not provide any additional feedback. Id. Becker determined it would not be appropriate to issue the plaintiff progressive discipline or put her on a performance improvement plan in lieu of termination. Id. at ¶91. At no time prior to the plaintiff's termination did Becker tell the plaintiff that her performance was unsatisfactory and needed improvement or that she was at risk of termination. Dkt. No. 46 at ¶32.

## II.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

9

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). "[T]o survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

## III.  Analysis

As explained above, the defendant moved for summary judgment on all the plaintiff's claims, and the plaintiff did not oppose the motion on three claims, leaving two claims for the court to decide: 1) the plaintiff's Title VII pay discrimination claim premised on the defendant paying Mertens a higher salary and 2) the plaintiff's Title VII gender discrimination claim arising from her termination.

### A.    Title VII Discriminatory Pay Claim

"Title VII makes it unlawful for an employer to 'discriminate against any individual with respect to [her] compensation . . . because of such individual's . . . sex.'" Lauderdale v. Ill. Dep't of Human Servs., 876 F.3d 904,

909 (7th Cir. 2017) (quoting 42 U.S.C. §2000e-2(a)(1)). "When pursuing an unequal pay claim, the plaintiff must show that the protected grounds . . . caused the disparity in compensation." Palmer v. Ind. Univ., 31 F.4th 583, 589 (7th Cir. 2022) (citing Igasaki v. Ill. Dep't of Fin. & Pro. Regul., 988 F.3d 948, 958 (7th Cir. 2021)).

At the summary judgment stage, a plaintiff making a Title VII claim may use multiple approaches. She may choose to utilize the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). A plaintiff using the McDonnell Douglas framework has the initial burden of establishing that she (1) belonged to a protected class; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was similarly situated to other employees who were not members of the protected class and were treated better. David v. Bd. of Trs. of Cmty. Coll. Dist. No. 50, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff satisfies that burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. If the employer does so, the burden shifts back to the plaintiff to show that the employer's explanation is pretextual. Id.

But the Seventh Circuit has made clear that a plaintiff who eschews McDonnell Douglas can support her discrimination claim with "direct or circumstantial evidence that supports an inference of intentional discrimination." Joll v. Valparaiso Cmty. Schs., 953 F.3d 923, 929 (7th Cir. 2020) (quotation omitted). Under this approach, the court must determine

11

"whether the totality of the evidence permits a reasonable juror to conclude that there would have been no disparity in pay were [the plaintiff] a different [gender] 'and everything else remained the same.'" Palmer, 31 F.4th at 589 (quoting Vega v. Chi. Park Dist., 954 F.3d 996, 1004 (7th Cir. 2020)). That said, "an unequal pay claim begs for some comparator evidence"—comparison with "an employee who is directly comparable to the plaintiff 'in all *material* respects.'" Id. at 590 (quoting Warren v. Solo Cup Co., 516 F.3d 627, 630-41 (7th Cir. 2008)).

The defendant argues that the plaintiff cannot prove that she was paid less than Mertens because of her gender. Dkt. No. 31 at 11. It contends that the plaintiff has not presented evidence showing that Becker—or anyone else—considered the plaintiff's gender when deciding her salary or that anyone made any gender-based derogatory comments toward the plaintiff when Becker made the salary decisions. Id. at 12. The defendant points out that when the plaintiff raised concerns about her pay, Becker gave her a raise and continued to give her annual incentive bonuses. Id. It argues that the plaintiff cannot show that she was discriminated against because of her gender under the McDonell Douglas burden-shifting method because she cannot establish that she was similarly situated to male employees who earned higher salaries. Id. The defendant argues that, though he had the same job title as the plaintiff, Mertens is not a similarly situated individual because Mertens had more extensive work experience, more direct reports, greater responsibilities, a master's degree and more challenging and complex duties. Id. at 13. The

12

defendant insists that unlike the plaintiff, Mertens was not the subject of staff and board complaints about his leadership, attendance and support. Id. at 14.

The plaintiff responds that Becker could not explain the correlation between Mertens's qualifications and his greater pay and that even Becker denied there was any connection between Merten's higher degree of education and his pay. Dkt. No. 44 at 25. The plaintiff suggests that there is reason to question the salary discrepancy because both she and Mertens were receiving the same salary when they were working as branch executive directors. Id. The plaintiff also argues that Becker's willingness to increase her salary after she complained about the discrepancy in pay calls the defendant's justifications into question. Id. at 26.

The plaintiff did not address the McDonnell Douglas burden-shifting framework, so the court must determine whether the plaintiff can support her discrimination claim with "direct or circumstantial evidence that supports an inference of intentional discrimination," Joll, 953 F.3d at 929, including "some comparator evidence" with "an employee who is directly comparable to the plaintiff 'in all *material* respects,'" Palmer, 31 F.4th at 590. To survive summary judgment, the plaintiff must show that there are "enough common factors" between the plaintiff and her comparator (Mertens) "to allow for a meaningful comparison." Palmer, 31 F.4th at 590 (quoting Coleman v. Donahoe, 667 F.3d 835, 847 (7th Cir. 2012)). Generally, a plaintiff 'must at least show that the comparators . . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's

13

treatment of them." <u>Khowaja v. Session</u>, 893 F.3d 1010, 1016 (7th Cir. 2018) (quoting <u>Coleman</u>, 667 F.3d at 846). While the "similarly situated" inquiry is flexible, the court generally considers whether the plaintiff and the comparator "had the same job description, were subject to the same standards, had the same supervisor, and had comparable experience, education, and other qualifications." <u>Poullard v. McDonald</u>, 829 F.3d 844, 855 (7th Cir. 2016) (citing <u>Boumehdi v. Plastag Holdings, LLC</u>, 489 F.3d 781, 791 (7th Cir. 2007)).

It is undisputed that the defendant paid the plaintiff less than Mertens. Dkt. No. 37 at ¶21. The question is whether the plaintiff has shown that she and Mertens share enough common, material factors to allow for a meaningful comparison. <u>Palmer</u>, 31 F.4th at 590. The parties agree that plaintiff and Mertens both directly reported to Becker. Dkt. No. 41 at ¶14. This factor weighs in favor of finding that Mertens is an appropriate comparator. But the record does not directly address whether the plaintiff and Mertens were "subject to the same standards." The court will consider the other two factors in more detail.

### 1.    *Job Description and Standards*

The summary judgment evidence does not include official job descriptions of the two VP of Operations positions, but the summary descriptions show that the roles involved different functions. Mertens's primary responsibilities included "supervising the branch Executive Directors, helping manage the branches, managing and preparing operating multi-million budgets, resolving membership issues, managing personnel, and development of branch board and community engagement." Dkt. No. 41 at ¶10. The

14

plaintiff's position involved "administrative oversight over membership, marketing, financial development, and healthy living" over a smaller group of staff. Id. at ¶11. Mertens oversaw three full branch facilities, three satellite branches and ten school-age sites, while the plaintiff led the YMCA-GWC Association marketing, membership, healthy living and financial development departments at the Association Level. Id. at ¶¶22–23. Although the plaintiff argues that Mertens had "direct management" only over the West Suburban branch, she has not shown that she and Mertens had substantially similar job responsibilities. Nor has she disputed that Mertens had more direct reports or that her position was created to oversee a "smaller group of staff." Dkt. No. 39 at 30, Tr. p. 115, line 25; Tr. p. 116, line 1–3; Dkt. No. 41 at ¶11. And as Becker explained "[t]he pace of branch operations is a larger portfolio and is a faster, more complex role that that of an administrative or strategic role in the defined areas of membership, marketing, financial development, and healthy living." Dkt. No. 39-5 at 9, Tr. p. 31, lines 9–16. These differences weigh against a finding that Mertens is an appropriate comparator.

2.    *Comparable Experience, Education and Other Qualifications*

It is undisputed that Mertens had a higher education level than the plaintiff, having obtained a master's degree in physical education and sports administration compared to the plaintiff's bachelor's degree in economics. Dkt. No. 41 at ¶17. It also is undisputed that Mertens reported directly to Becker for two and half years longer than the plaintiff. Id. at ¶16. Becker testified in his deposition that based on this difference, he believed Mertens "better

15

understood the role and expectations" of the company and "had a high level of demonstrated success." Dkt. No. 39-5 at 10, Tr. p. 35, lines 19–25. This factor weighs in favor of finding that Mertens is not an appropriate comparator.

Given the difference in job responsibilities and the lack of comparable experience, education and other qualifications, a reasonable jury could not find that Mertens is a fair comparator on whom to base the plaintiff's pay discrimination claim. The plaintiff has not identified any other comparators. Absent a comparator, the record does not support an inference that the defendant intentionally paid the plaintiff less due to her gender. The plaintiff has failed to establish a pay discrimination claim under Title VII and the defendant is entitled to summary judgment on that claim.

B.    Title VII Discriminatory Termination Claim

Like Title VII discriminatory pay claims, claims for discriminatory termination under Title VII can be presented under the McDonnell Douglas framework or based on the evidence a whole as described in Ortiz v. Warner Enterprises, Inc., 834 F.3d 760, 765 (7th Cir. 2016). Igasaki, 988 F.3d at 958-59. Under Ortiz, the court "ask[s] whether the totality of the evidence shows discrimination." Id. (citing Ortiz, 834 F.3d at 765). "Evidence must be considered as a whole, rather than asking whether a particular piece of evidence proves the case by itself." Ortiz, 834 F.3d at 765.

The defendant argues that the plaintiff has offered no direct evidence of discriminatory intent and cannot state a *prima face* case under the indirect method. Dkt. No. 31 at 18. The plaintiff argues that under the Ortiz approach,

the court should deny summary judgment because a reasonable jury could conclude that the defendant's explanation for terminating the plaintiff was pretextual. Dkt. No. 44 at 4. The plaintiff also maintains there is evidence from which a reasonable jury could infer that the plaintiff's gender and/or child-bearing capacity played a motivating factor in her termination. Id. at 22.

1.    *Evidence of Discriminatory Intent*

The plaintiff argues that there is evidence demonstrating a gender-based motivation for her termination. She reiterates that the defendant paid Mertens a higher salary and argues that the defendant treated Mertens more favorably with respect to time off from work. Dkt. No. 44 at 22–23. She argues that Becker made anti-pregnancy remarks after two members of the plaintiff's team became pregnant, commenting in the presence of the plaintiff in December 2019 that he needed to "change the water" and that "no one else on [the plaintiff's] team is allowed to get pregnant." Id. at 23. The defendant does not dispute that Becker made these comments but insists that they were nothing more than "stray remarks." Dkt. No. 40 at 10; Dkt No. 41 at ¶116. The defendant asserts that the plaintiff never complained about the comments. Dkt. No. 40 at 11. The plaintiff insists that Becker's statements were more than "stray remarks" and that he made the decision to terminate her when he knew she was again attempting to become pregnant. Dkt. No. 44 at 23.

The court has concluded that a reasonable factfinder could determine that there were non-discriminatory reasons for the pay differential between the plaintiff and Mertens. That fact, standing alone, does not support finding

17

discriminatory intent. But regarding the termination, there is also the question of whether a reasonable factfinder could find that Becker's pregnancy-related comments evinced an animus toward pregnancy and that he ultimately decided to terminate the plaintiff because of her desire, or her expressed intention, to become pregnant. See Hall v. Nalco Co., 534 F.3d 644, 649 (7th Cir. 2008) (explaining that an adverse employment action based on childbearing capacity presents a cognizable claim of sex discrimination under Title VII). The plaintiff alleges that after she informed Becker on January 27, 2020 of her third IVF attempt and her hope for a successful egg donor, Becker worked with Schlitt and Mertens to manufacture documentation of the plaintiff's poor performance to justify her termination. Dkt. No. 44 at 23–24.

Drawing all reasonable inferences in the plaintiff's favor, the court finds that the plaintiff has presented sufficient evidence to enable a reasonable factfinder to find that Becker's comments evinced an animus towards pregnancy. The comment that "no one else on [the plaintiff's] team is allowed to get pregnant" could cause a reasonable factfinder to conclude that Becker would be upset to learn, just weeks later, of the plaintiff's renewed attempt to conceive. Though the defendant characterizes Becker's statements as "stray remarks," stray remarks "may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decision marker, or those who influence the decisionmaker, and made close in time to the adverse employment decision." Dandy v. United Parcel Serv., Inc., 388 F.3d 263, 272 (7th Cir. 2004) (citing

18

Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994)). Becker, the person ultimately responsible for the decision to terminate the plaintiff, dkt. no. 41 at ¶42, made the pregnancy-related remarks in December 2019, just two months before he terminated the plaintiff. The remarks, the speaker and the timing of the remarks constitute circumstantial evidence sufficient to allow a reasonable factfinder to find that there was animus and discriminatory intent behind the termination.

### 2. *Evidence of Pretext*

The plaintiff also argues that her termination claim should survive summary judgment because she has presented evidence that would enable a reasonable factfinder to determine that the defendant's purported reasons for her firing were a pretext for discrimination. Dkt. No. 44 at 4–22. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000). "[O]nce the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury—not the court." Rudin v. Lincoln Land Cmty. Coll., 420 F.3d 712, 726 (7th Cir. 2005) (citation omitted). "To show pretext, a plaintiff 'must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons.'" Bates v. City of Chicago, 726 F.3d 951,

19

956 (7th Cir. 2013) (quoting Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781, 792 (7th Cir. 2007)). "A plaintiff can do this by showing that the defendant's reason for the adverse employment action (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the action." Id. (citing Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002)).

The defendant argues that the plaintiff cannot show that its proffered reasons for her termination were a pretext for gender discrimination. Dkt. No. 31 at 21. It contends that it is "undisputed that in early 2020, CEO Becker received direct complaints from staff" regarding the plaintiff's poor work ethic, lack of accountability, and leadership struggles. Id. at 22. The defendant insists that the plaintiff's performance issues—including her lack of support, poor attendance and failure to execute tasks—support the reasons for firing her and preclude the plaintiff from showing that the termination was motivated by her sex. Id.

The plaintiff presents multiple arguments why a reasonable factfinder could find the defendant's reasons were pretextual. She asserts that the defendant's reasons for her termination were vague and subjective generalizations not based in fact. Dkt. No. 44 at 4. She responds to Becker's deposition testimony about her "deterioration" in job performance by arguing that he could not point to specific incidents, relying only on general statements by certain employees. Id. at 5–6. She argues that other employees' statements regarding her performance fail to reference any specific incidents. Id. at 6. She

argues that still other employees reported having no problems with getting assistance or responses from her. Id. The plaintiff insists that she consistently received positive feedback on her performance and received no feedback signaling any problems. Id. at 9. She says that she received this positive feedback even in the weeks leading up to her termination. Id. at 9–10. The plaintiff says she was given additional responsibilities when Mertens was out of the office and then received an incentive bonus at the end of 2019. Id. at 10. The plaintiff says that it "makes no sense that after 20 years of dedication to the YMCA's mission and five successful years at the [defendant]—including three as a VP of Operations—[she] suddenly failed to perform her job." Id.

The plaintiff also argues that the defendant has not given a consistent explanation as to who made the decision to fire her. Id. She asserts that Becker's story that he made the decision with Daley and Jazwiecki is not supported by anyone's statements but Becker's, and that the statements of the others contradict Becker. Id. at 11–12. The plaintiff questions which documents Becker purportedly reviewed ahead of the making the decision. Id. at 12. The plaintiff also challenges the basis for the statements the defendant made to the Equal Rights Division (ERD) when it was investigating the plaintiff's claims. Id. at 14. She asserts that she did not have absenteeism and performance problems and that the defendant "made it up" to "manufacture" reasons for her termination in its submissions to the ERD. Id. at 14–18.

The plaintiff contends that the defendant relied on "outdated alleged performance issues" in its attempt to manufacture a reason for her

termination, specifically events that occurred prior to 2018, at least two years before she was terminated. Id. at 18. Finally, the plaintiff says that Becker "was untruthful in his deposition and changed his testimony when confronted with email messages that contradicted his sworn testimony on other matters he claims related to his firing of [the plaintiff]." Id. at 20.

The defendant reiterates that there is no genuine dispute that Becker terminated the plaintiff because he believed she demonstrated a lack of leadership and disregard for her job duties. Dkt. No. 40 at 14. It argues that even if a genuine dispute of material fact regarding the plaintiff's termination existed, the plaintiff has not presented evidence to defeat summary judgment because she must raise an issue of fact regarding *each* of the reasons proffered by the defendant. Id. The defendant also disputes the plaintiff's argument that the defendant failed to offer consistent reasons for the termination. Id. at 17. The defendant explains that at the time of the plaintiff's termination, Becker told her that she was "not performing at a level commensurate with a vice president of an organization." Id. According to the defendant, this statement is not inconsistent with the reasons the defendant articulates in its motion—that the plaintiff showed a lack of leadership and disregard for her job duties. Id. at 17.

The defendant also maintains that the plaintiff's concern regarding the termination documentation is insignificant because it is undisputed that Becker considered Kazwiecki's meeting notes, Daley's email and Mertens's email when deciding whether to terminate the plaintiff's employment. Id. at 18.

The defendant downplays the plaintiff's argument that the defendant made inconsistent and untruthful statements to the ERD, arguing that taking a position in federal court that differs from one previously presented to a state agency is not, by itself, evidence of pretext precluding summary judgment. Id. (citing Swanson v. Legget & Platt, No. 95 C 1074, 1996 WL 613158, at *19-20 (N.D. Ill. Oct. 22, 1996)).

The record shows that in the termination meeting, Becker told the plaintiff that her termination was due to her inability to conduct herself "at the commensurate level of vice president of the organization." Dkt. No. 39-5, Tr. p. 112, lines 3–4. Becker testified that during that meeting he did not provide the plaintiff with any additional information, did not have notes or talking points, did not refer to any document and did not draft anything in preparation for the meeting other than the termination notice. Id., lines 5–24. When the plaintiff continued to ask for more explanation, Becker told her that the decision had been made and refused to provide her any additional reasons or further explanation. Id., Tr. p. 113, lines 4–12. But Becker also testified that in the four to six weeks prior to the plaintiff's termination, he received a series of reports and feedback regarding the plaintiff's "lack of leadership, direction, and communication that [the plaintiff] was not providing to her direct reports," not leading her branch executives through assigned duties, "and overall . . . not leading in a way that was commensurate with the vice president role that she had in [the defendant's] organization." Id., Tr. p. 92, lines 3–22.

23

When asked what led him to draw those conclusions, Becker testified, "[t]he concern from her direct reports that she was not providing them with the communication and direction that they needed. Her lack of physical presence. At times that they tried to reach her with no-call, no-show was the beginning of my concerns." Id., Tr. p. 93, lines 8–18. Asked to provide any other instances leading Becker to determine her work was not up to par, Becker provided two: "One was specifically related to the strategic plan and deadlines that were not met, and the other was related to the lack of attendance at branch board meetings that [the plaintiff] was clearly expected to attend and had told leadership and Kristen Stoll, one of her direct reports that she would be attending." Id., Tr. p. 93, lines 19–25; Tr. p. 94, lines 1–5.

The plaintiff contends that Becker's failure to articulate to her the grounds for termination at the time of her termination is evidence of pretext. Dkt. No. 35 at 11. In Emmel v. Coca-Cola Bottling Co. of Chi., 95 F.3d 627 (7th Cir. 1996), the Seventh Circuit reasoned that the jury could infer pretext when an employer failed to express an explanation for not promoting an employee despite several opportunities to do so and then relied on that explanation as a legitimate, non-discriminatory reason for failing to promote at trial. Id. at 634. As the Seventh Circuit explained,

> When Emmel asked Walsh why she was not promoted, the appropriate answer, if it were true, was that she was not qualified because she did not have recent supervisory experience (or for that matter that she worked in the wrong zone). If true, this would certainly be an appropriate response. Even if not entirely true, it would have been a "better" response in that it might not have caused this lawsuit. So not only did Walsh not "truthfully" answer with this explanation at the seemingly appropriate time, he did not even

24

fabricate it as an answer at that time. An obvious inference, apparently the one the jury drew, is that it was not the true reason at the time Coca–Cola made its decision.

Id.

An employer's failure to provide its employee with a specific reason for her termination at the time of firing does not automatically mean that the plaintiff can show pretext for a justification raised by the employer during litigation. The plaintiff in Pugh v. City of Attica, Ind., 259 F.3d 619 (7th Cir. 2001), argued that a reasonable factfinder could find that the defendant's proffered reason for his termination was a pretext where the defendant did not come forward with the justification for the termination—that plaintiff had allegedly misappropriated funds—until after the plaintiff filed suit. Id. at 629. Although the plaintiff's termination letter did not state the reason for his discharge and his supervisor had failed to tell the plaintiff the reason behind his termination, the court found that these circumstances alone did not create a pretext because the defendant provided evidence through board minutes and an investigation report that the decision to discharge the plaintiff for misappropriation of funds was formulated prior to the suit. Id.

The defendant argues that Becker's termination decision is supported by emails in which employees complained about the plaintiff's poor work performance. On January 31, Laura Jazwiecki met with Laurie Schlitt to "gather and document information regarding concerns Ms. Schlitt had raised to CEO Becker." Dkt. No. 24 at ¶5. Jazwiecki wrote up a summary of the meeting in a note she shared with Becker. Id. at ¶6; Dkt. No. 24-1. According to that

25

meeting note, Schlitt explained to Jazwiecki there was a perception that the plaintiff was never at work and that the plaintiff was not leading the team. Dkt. No. 24 at ¶6. Schlitt reported concerns from another employee that the plaintiff was not training an employee over whom she had direct supervision. Id. Jazwiecki also documented a January 31, 2020 meeting she had with Mertens in which Mertens informed her that multiple employees had voiced concerns regarding the plaintiff, including a running joke that the plaintiff was "not here again today." Dkt. No. 24-2. Three days later, on February 3, 2020, Mertens emailed Becker, Jazwiecki and Linda Daley explaining that he "just spoke with Kristen and got more information on the past 30 days." Dkt. No. 25-2. In that email, Mertens wrote:

> Kristen told me that [the plaintiff] scheduled meetings with each exec roughly 1-2 weeks in advance (early January) and only attended two of the meetings, after each one was canceled and rescheduled. Kristen said that [the plaintiff] attended the rescheduled meeting with Aaron at TC and with Kathy at Waukesha. She did not attend Mukwonago, Southwest or West Suburban and would text Kristen that day of notifying.

Id. On February 10, 2020, Mertens sent another email to Jazwiecki recounting a conversation he had with "Carley" who complained to Mertens that the plaintiff was not providing her any support. Dkt. No. 25-1.

The plaintiff argues that a reasonable factfinder could doubt the content of the meeting notes and emails because she received an annual incentive bonus in December 2019, and because she received positive feedback regarding her presentation at a December 12, 2019 rally and at her 2020 meeting with Becker in which he approved her team's 2020 performance goals and

26

complimented her plan. Dkt. No. 44 at 9–10. She argues that a factfinder could question the motivation behind the emails given the timing of her meeting with Becker on January 27, 2020 and the dates that Mertens and Jazwiecki started reporting on the plaintiff's performance issues to Becker.

The plaintiff has presented a genuine issue of material fact as to whether her performance motivated Becker to terminate her. Although a factfinder could conclude that the defendant's reasons for firing the plaintiff were legitimate, the plaintiff has shown that there is reason to question Becker's justifications. For example, there are inconsistencies as to why Jazwiecki and Mertens sent Becker their emails regarding the plaintiff's performance issues. Becker testified that he did not know why Jazwiecki prepared the meeting notes as part of the "evaluation process." Dkt. No. 39-5 at 61, Tr. p. 237, lines 7–14. But Daley testified that Becker asked Jazwiecki (who reported to Daley) "to investigate some of the claims that were brought to him." Dkt. No. 39-12 at 15, Tr. p. 55, lines 3–5. Again, though Becker testified that he did not ask Daley for documentation to support a termination decision, dkt. no. 39-5 at 57, Tr. p. 223, lines 20–24, Daley testified that Becker "asked [her] to write down some complaints that [she] had made verbally to him about [the plaintiff's] attendance and lack of presence," dkt. no. 39-12 at 15, Tr. p. 54, lines 16–25. Meanwhile, Mertens testified that Jazwiecki asked him to prepare an email, dkt. no. 39-14 at 13, Tr. p. 48, lines 13–21, while Becker testified that he did not ask Mertens directly or through Jazwiecki to get information, dkt. no. 39-5 at 63–64, Tr. p. 248, lines 13-25; Tr. p. 249, lines 1–25; Tr. p. 250, lines 1–15.

27

Mertens testified that he did not remember why he collected information on the "past 30 days," the subject of his email, dkt. no. 39-14 at 18, Tr. p. 69, lines 19–23. The defendant has not provided any explanation for why it began to investigate the plaintiff's work performance when it did, when it never had done so before, despite the fact that the plaintiff allegedly had performance problems in 2019.

As the plaintiff contends, given the timing of Becker's comments on employees' pregnancies, the plaintiff's conversation with Becker on January 27, 2020 that she planned on pursuing IVF and the unexplained reasons for collecting information on the plaintiff's performance starting just three days later, there is a genuine issue of material fact as to whether the defendant's explanations for the plaintiff's termination were a pretext for prohibited discrimination. Hitchcock v. Angel Corps, Inc., 718 F.3d 733, 740 (7th Cir. 2013). The court will deny summary judgment on the Title VII wrongful termination claim.

## IV. Conclusion

The court **GRANTS IN PART** and **DENIES IN PART** the defendant's motion for summary judgment. Dkt. No. 20. The court **GRANTS** summary judgment on Counts One, Two, Four and Five and **DENIES** summary judgment on Count Three.

The court **ORDERS** that Counts One, Two, Four and Five are **DISMISSED**.

The court will calendar a scheduling conference to discuss with the parties a possible trial date or other next steps.

Dated in Milwaukee, Wisconsin this 26th day of December, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**